IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS KELLY and MICHAEL KRZESZEWSKI, | ) ) ) | |
| Plaintiffs | ) | Cause No. 4:15-cv-01825-JMB |
| v. | ) ) | JURY TRIAL DEMANDED |
| MONSANTO CO., SOLUTIA, INC., and PHARMACIA LLC, | ) ) ) | ON ALL COUNTS |
| Defendants | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND

Plaintiffs' motion for remand (Doc. #13) should be denied, because this action was properly removed. Plaintiffs do not challenge removal on procedural grounds, but rather claim it is substantively improper. It is not. As shown below, Defendants have satisfied all requirements for removal under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

## LEGAL STANDARD

"[D]efendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). "Unlike the general removal statute, the federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n*, 790 F.3d 457, 466-67 (3d Cir. 2015). Indeed, "the presumption under the general removal statute favors remand, due to the limited jurisdiction of federal courts, while the presumption under the federal officer removal statute favors removal, for the benefit of the federal officer involved in the case." *In re Asbestos Prods. Liab. Litig.*, 770 F.Supp.2d 736, 741 (E.D. Pa. 2011).

The federal officer removal statute permits removal of any civil action commenced in state court against "any officer (or any person *acting under* that officer) of the United States or of any agency thereof, in any official or individual capacity, for or relating to any act under color of such office . . . ." 28 U.S.C. § 1442(a)(1) (emphasis added).  Four elements are required:  "(1) a defendant has acted under the direction of a federal officer, (2) there was a causal connection between the defendant's actions and the official authority, (3) the defendant has a colorable federal defense to the plaintiff's claims, and (4) the defendant is a 'person,' within the meaning of the statute." *Jacks v. Meridian Res. Co.,* 701 F.3d 1224, 1230 (8th Cir. 2012).  After the 2011 amendments to the removal statute, a plaintiff's claims satisfy the "causal connection" requirement, if they are "for *or relating to*" actions performed under color of federal office.  *In re Commonwealth's Motion*, 790 F.3d at 471-72.  The Supreme Court "has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of §1442(a)(1).'" *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).

## SUMMARY OF THE ARGUMENT

Plaintiffs seek to hold Defendants liable for manufacturing polychlorinated biphenyls ("PCBs") from 1929-1977.  During that period, Pharmacia[1] worked hand-in-hand with the federal government to ensure adequate production of PCBs to meet the nation's military needs and to ensure the safety of the nation's power grid.  In the 1940s, the federal government determined that increased production of PCBs was necessary for the national defense and funded multiple expansions of Pharmacia's PCB-manufacturing facilities to meet military demands.  At

---

[1] Between 1935 and 1977, Pharmacia (then known as Monsanto) manufactured and sold PCBs.  Pharmacia is the only Defendant to have manufactured PCBs.

times, the majority of PCBs produced by Pharmacia were used by the U.S. military. During other periods, Pharmacia produced PCBs exclusively for use in electrical applications required by federal OSHA regulations.  At various points, Pharmacia manufactured PCBs (1) at the express direction and command of the federal government, pursuant to the Defense Production Act; (2) as a direct contractor for multiple departments and agencies of the federal government; (3) for federal defense contractors, who needed them to meet exacting military specifications in producing items for the U.S. military; and (4) for uses required by federal OSHA regulations.  In each context, Pharmacia manufactured PCBs under color of federal office.

Plaintiffs' claims are related to Pharmacia's actions performed under color of federal office – *i.e.*, the manufacture of PCBs.  Plaintiffs' purported limitation of their claims to PCBs used in open applications does not alter that fact.  First, the purported limitation is illusory, because Plaintiffs are, in fact, unable to determine whether the PCBs to which they were exposed were used in open or closed applications.  Second, because Pharmacia manufactured PCBs for both open and closed uses under color of federal office, the purported limit would not support remand in any event.  Plaintiffs' claims relate to actions Pharmacia took under color of federal office, and Pharmacia asserts federal defenses to those claims.  This case was properly removed.

## ARGUMENT

## I.    Pharmacia Manufactured PCBs Under Color of Federal Office.

The Supreme Court has instructed that, as used in § 1442(a)(1), the "words 'acting under' are broad, and … the statute must be 'liberally construed.'"  *Watson v. Philip Morris Cos., Inc*., 551 U.S. 142, 147 (2007).  Thus, the "acting under" requirement sets a low bar.  *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1088 (6th Cir. 2010) ("The Supreme Court had indicated that '[t]he hurdle erected by this requirement is quite low.'") (quoting *Isaacson v. Dow Chem. Co.*, 517

F.3d 129, 137-38 (2d Cir. 2008)).  *See also Jacks*, 701 F.3d at 1230 ("While not limitless, '[t]he words "acting under" are broad,' and the Supreme Court 'has made clear that the statute must be "liberally construed.""') (quoting *Watson*, 551 U.S. at 147).

A.   **Pharmacia manufactured PCBs to meet the needs of the U.S. military under color of federal office.**

The United States military was an important consumer of PCBs from the 1940s until the mid-1970s.  Many products used by the U.S. Army, Navy and Air Force had exacting military specifications for fire resistance, thermal and electrical conductivity and other attributes, which required the use of PCBs in their manufacture.[2]  The U.S. Department of Defense specifically selected PCBs for use in many applications because of their performance characteristics:

> Older Department of Defense (DOD) systems employed a variety of components which have been identified as containing polychlorinated biphenyls (PCBs) either as contaminants or as part of the formulation.  These PCB articles were selected for their performance characteristics including fire retardant properties.

U.S. Air Force Armstrong Laboratory, AL/OE-TR-1996-0153, Risk Assessment of Polychlorinated Biphenyls (PCBs) On-Board Navy Ships (Dec. 1996) at 1 (Ex. A).  On older U.S. Navy vessels "PCBs are common in insulation material, electrical cable, and ventilation gaskets … insulation and soundproofing material, missile launch tubes, electrical cables, banding and sheet rubber, heat-resistant paints, hull coatings and electrical transformers, because of their performance characteristics including fire retardant properties."  Still, *et al.*, *Estimation of the Health Risks Associated with Polychlorinated Biphenyl (PCB) Concentrations Found Onboard*

---

[2] A military report identifies several PCB-containing items found on nuclear submarines and their related military specifications, including: (1) Ensolite hull insulation (MIL-P-15280); (2) Cork hull insulation (MIL-C-561/HH-C-561); (3) Armaflex hull insulation (MIL-P-15280); (4) Heat resistant and aluminum paste paint (TT-P-28, MIL-P-14276 or DOD-P-24555); and (5) Wool felt ventilation gaskets (MIL-G-20241/MIL-STD-2148).  U.S. Air Force Armstrong Laboratory, AL/OE-TR-1996-0153, Risk Assessment of Polychlorinated Biphenyls (PCBs) On-Board Navy Ships (Dec. 1996) at 19 (Ex. A).

*Older U.S. Navy Vessels*, Applied Occupational and Envtl. Hygiene 18: 737-758 at 737 (2003) (Ex. B).  At times, the majority of PCBs produced by Pharmacia were for defense purposes.[3]

In the years leading up to the Second World War, the federal government determined that increased PCB production was necessary for the national defense, and funded multiple expansions of Pharmacia's PCB-manufacturing facilities to meet military demands.  PCBs were being used extensively by the U.S. military and, by mid-1941, Pharmacia was unable to keep up with demand.  On May 21, 1941, it submitted a request for issuance of a Necessity Certificate to the Secretary of War and the Advisory Commission to the Council of National Defense.  *See* HAGOV0001366-1372, at 1366 (Ex. E).  Pharmacia requested $275,000 from the government to expand its facilities to increase the production of diphenyl used in making PCBs.  *Id*. at 1366-67.  The request was assigned Government File Number WD-N-2134.  *Id*. at 1366.  On May 23, 1941, the Advisory Commission sent an Application for Necessity Certificate on Pharmacia's behalf to the Emergency Facilities Committee.  HAGOV0001373-1390 at 1373, 1378 (Ex. D).  The application stated that the new facilities would increase diphenyl production from 720,000 to 1,200,000 pounds per month, and that 100% of the new facilities would be used for "Defense Purposes."  *Id*. at 1373.  W.W. Odell, E.W. Reid and P.T. Homan, from the Office of Production Management, recommended 100% certification stating:  "Because of the need of this material in the defense program it is recommended that a Certificate of Necessity be granted 100% for the described facilities."  *Id*. at 1373-74, 1378-79.  Major C. V. Morgan, Army Representative, Commodities Division, also recommended certification, finding "the additional facilities are

---

[3] *See, e.g.,* HAGOV0000186-187 at 186 (Ex. C) ("In the case of aroclors, we understand the majority of our current production is used in end products for use in war plants and for use as Army and Navy material."); HAGOV0001373-1390 at 1373 (Ex. D) (application for Necessity Certificate, noting that 100% of facilities to increase diphenyl production from 720,00 to 1,200,000 pounds per month would be devoted to defense purposes).

necessary to the national defense," because chlorinated diphenyls "are used… in tranformers and condensers… [and] in the production of Halowax which is essential in the insulation of Navy cable." *Id*. at 1376. Similarly, Lieutenant Col. G.H. Foster, Sig. Corps recommended certification, because an "[i]ncrease of the production of this product is deemed essential by the [Army Navy Munitions Board]…." *Id*. at 1377. The Necessity Certificate was issued on August 6, 1941. *See* HAGOV0001436-1452 at 1445 (Ex. F).

On July 16, 1941, Pharmacia submitted another request for issuance of a Necessity Certificate to the Secretary of War and the Advisory Commission to the National Defense. *See* HAGOV0001391-1403 at 1391 (Ex. G). This request, assigned Government File Number WD-N-2945, was to increase production of "Aroclors, chemically known as chlorinated diphenyl." *Id*. It noted that "the United States Navy requires cable covered with material containing Aroclor," and the Army and Navy also used Aroclors in asphalt-felt protected metal roofing and siding. *Id*. at 1393. On July 17, 1941, an Application for Necessity Certificate was sent on Pharmacia's behalf to the Emergency Facilities Committee. *See* HAGOV0001404-1425 at 1404 (Ex. H). It explained that the new facility would double the production of Aroclors, from 600,000 to 1,200,000 pounds per month, and that 100% of the increased production would be "for Defense Purposes." *Id*. "[T]he Commodities Division recommended issuance of the certificate in the interest of national defense and stated that the chlorination of diphenyl is used in condensers and in Halowax (a cable coating material used in large quantities by the Navy)…." *Id*. at 1410. The Office of Production Management recommended the Certificate of Necessity be granted 100%, finding "the facilities are necessary in the interest of National Defense…." *Id*. at 1405. The Necessity Certificate was issued on September 24, 1941. *See* HAGOV0001436-1452 at 1445 (Ex. F).

During the war, Pharmacia produced significant amounts of PCBs for the U.S. military in close collaboration with the federal government.  By 1944, Pharmacia's Anniston, Alabama plant was devoting 85% of its capacity to production of Aroclors, diphenyls and other materials for the war effort, and was nominated for a third renewal of its Army-Navy "E" Award for its support of the national defense.  *See* HAGOV0000158 (Ex. I).  The renewal was granted on July 26, 1944 by the Navy Board for Production Awards, for "supply[ing] our fighting forces with the materials needed to bring the war to a successful conclusion."  *See* HAGOV0000159 (Ex. J).  In 1945, Pharmacia received a fourth renewal of its Army-Navy "E" Award for its "untiring efforts…to produce the equipment needed for victory" in the war.  HAGOV0000160 (Ex. K).  Army-Navy E awards were granted to only 5% of all war production facilities in the country, and were based on quality and quantity of production, records on accidents, health sanitation, and plant protection, and other factors.[4]  The "E" pennant was awarded to Pharmacia for its "extraordinary accomplishment in production of raw materials essential to the Allied war program," and its "outstanding efforts in the production of Naval Material vital to our national defense."  *See* HAGOV0000192-193 (Ex. M).

The military continued to use PCBs extensively through the mid-1970s.  Pharmacia produced significant quantities of PCBs for direct sale to the U.S. military,[5] and continued to manufacture PCBs for federal defense contractors, to enable them to meet exacting military specifications in producing items for the U.S. military.  Military specifications expressly called for the use of Pharmacia's PCB-containing Aroclor products in manufacturing certain products.

---

[4] http://www.history.navy.mil/research/library/online-reading-room/title-list-alphabetically/a/army-navy-e-award.html (visited 2/2/16) (Ex. L).

[5] *See* Notice of Removal Ex. B (Doc. #1-2) (invoices reflecting direct PCB sales to the U.S. Army, U.S. Navy, and U.S. Air Force and other federal government purchasers in the 1960s and 1970s).

For example, federal specification TT-P-28c for heat-resisting aluminum paint used by the military – an open application - called for the use of one of Pharmacia's PCB-containing products, Aroclor 1254.  *See* Fed. Spec. TT-P-28c (Ex. N).   The Navy used "a great deal" of this paint, which was used on high pressure steam lines and steam stacks.  *See* 3/3/70 Call Report to W.F. Waychoff (Pharmacia sold Aroclor 1254 to defense contractor for the production of "heat resistant aluminum paint. … The Navy uses the paint (covered under govt. spec. TTP-28C) a great deal.") (Ex. O).  *See also* Still at 743 ("[t]he median and mean total PCB concentrations for paints [on older Navy ships] were … relatively high.") (Ex. B).

Pharmacia also manufactured Aroclor 1254 to meet military specifications for other products, including certain electrical wire and cable applications.  *See* 6/2/70 Call Report to W. Clark (Ex. P) (Pharmacia produced Aroclor 1254 for defense contractor Chemical Products, which "used [it] exclusively in cellulosic lacquer utilized to meet Military Specs for lacquer used in wire and cable applications"); 9/8/70 Call Report to F. Miller (Ex. Q) (Pharmacia manufactured Aroclor 1254 for defense contractor Marblette Company, which used it to meet specifications of a defense contract with the U.S. military for electrical wire); 6/25/70 Call Report to W. Clark (Ex. R) (Pharmacia produced Aroclor-1254 for company whose "usage (25,000 lbs.) all goes into one wire coating compound for the U.S. Navy").

For certain products, the military determined that use of PCBs was essential, and that no acceptable substitutes were available.  For example, the federal government determined that Pharmacia's PCB-containing product, Aroclor 1242, was necessary in manufacturing missiles.  As defense contractor Raytheon explained to Pharmacia:

> We make these concessions and agreements only to obtain your agreement
> promptly to ship Aroclor 1242 and because the government has directed us to
> proceed to manufacture missiles but has refused to authorize Raytheon to qualify
> a new potting material which would avoid use of Aroclor 1242.

*See* Notice of Removal (Doc #1) at ¶ 11 and Ex. E (Doc #1-5).

In 1971, Pharmacia determined that it would stop manufacturing PCBs for use in open applications due to concerns over their environmental persistence.[6]  In response, the federal government expressly directed Pharmacia, pursuant to the Defense Production Act, to continue such manufacture for military contractors.  *See, e.g.*, Letter from J. Richards, U.S. Dept. of Commerce re: BDC Case 36397 to W. Papageorge, Monsanto Industrial Chemicals (Nov. 14, 1972) (Ex. U) (directing Pharmacia to accept purchase order for Aroclor 1242 "pursuant to Section 101 of the Defense Production Act of 1950").  The Defense Production Act "was passed in 1950 at the outset of the Korean war to ensure governmental access to materials necessary for the war effort."  *Ryan v. Dow Chem. Co.*, 781 F.Supp. 934, 945 (E.D.N.Y. 1992).  Under the Act, contractors "were forced under threat of criminal sanction to perform contracts for the Defense Department."  *Id*.  Pharmacia obeyed the government's directive to keep selling PCBs for open uses to federal contractors.  *See* Letter from W. Papageorge, Monsanto Industrial Chemicals, to J. Richards, U.S. Dept. of Commerce re:  BDC Case 36397 (Nov. 17, 1972) at 1 (noting "Monsanto Company no longer sells Aroclor 1242 for the uses which we understand Emerson and Cuming intend," but agreeing to comply with government directive) (Ex. V).

The federal government continued to invoke the Defense Production Act to require Pharmacia to sell PCBs to defense contractors for open uses through at least mid-1974.  *See, e.g.*, Letter from J. Richards, U.S. Dept. of Commerce, Domestic and Intl. Business Administration to

---

[6] *See* EPA, Industry Views on the Use of Polychlorinated Biphenyls in Transformers and Capacitors (June 1976) at 7 (Statement of F.J. Fitzgerald, Vice-President, Monsanto Chemical Company) (Ex. S); *see also* EPA, PCBs in the United States, Industrial Use and Environmental Distribution, EPA 560/6-76-005 (Feb. 25, 1976) at 2 ("by mid-1971, the Monsanto Industrial Chemicals Co., the sole U.S. producer, had voluntarily terminated sales of  [PCBs] for all but closed electrical systems uses") (Ex. T).

J. Morse, Monsanto Company re: OIM Case No. 38407 (July 24, 1974) (directing Pharmacia to sell PCBs to Raytheon for open use) (Ex. W); Letter from T. Gossage, Monsanto Company, to U.S. Dept. of Commerce re Case No. 38047 (Aug. 6, 1974) (confirming compliance with directive to sell PCBs to Raytheon) (Ex. X).

Pharmacia was acting under color of federal office when it manufactured the PCBs required by the U.S. military for the national defense under the close supervision of the federal government – at times using facilities financed by the federal government, at the express direction and command of the federal government, and under threat of criminal sanctions.  The federal courts have repeatedly held that a company acts under color of federal office where it is "helping the Government to produce an item that it needs."  *Jacks*, 701 F.3d at 1232; *Watson*, 551 U.S. at 153-54 (company acts under color of federal office when it "provid[es] the Government with a product that it used to help conduct a war.").  As the Supreme Court has explained:

> The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.  In the context of *Winters* [*v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998)] for example, Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war.  Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.

*Watson*, 551 U.S. at 153-54.  *See also Jacks*, 701 F.3d at 1231("the production of Agent Orange by a private defense contractor, Dow Chemical, to help the government conduct a war is an example of the sort of assistance contemplated by the statute.").  A defendant compelled to produce materials under the Defense Production Act is acting under federal office and entitled to remove.  *Winters v. Diamond Shamrock Chem. Co.*, 901 F.Supp. 1195, 1200 (E.D. Tex. 1995), *aff'd*, 149 F.3d 387.

- 10 -

Plaintiffs contend that Pharmacia did not act under color of federal office in manufacturing the PCBs needed by the U.S. military, when Pharmacia was not a direct government contractor. Plaintiffs' argument elevates form over substance. The "acting under" inquiry turns on the substance of the relationship between the defendant's actions and federal authority, not on the label attached to it. *See Jacks*, 701 F.3d at 1230 ("a private person's actions 'must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior'") (quoting *Watson*, 551 U.S. at 152). While a direct contract with the government can demonstrate the kind of government direction required for removal, it is not required. *See, e.g., Badilla v. Nat'l Air Cargo, Inc*., 2014 WL 6390324, at *2, 7 (W.D.N.Y., Nov. 17, 2014) (defendant may have acted under color of federal office, even though it "did not have a contract directly with the United States," but instead "was providing services … pursuant to a subcontract…").

Here, the federal government was closely involved in supporting, monitoring, directing and evaluating Pharmacia's production of PCBs for the military, even when Pharmacia was acting as a subcontractor. Indeed, the federal government expressly directed Pharmacia to sell PCBs *as a subcontractor* to its direct military contractors. The Navy awarded Pharmacia the Army-Navy "E" Award for its work *as a subcontractor*. *See* HAGOV0000158 (Ex. I) (identifying Pharmacia as a subcontractor for production of war materials). And the federal government granted Pharmacia multiple Necessity Certificates and financed its new facilities to increase Pharmacia's production of PCBs *as a subcontractor*. *See* HAGOV0001366-1372 at 1368 (requesting Necessity Certificate and reporting no direct government contracts) (Ex. E). As both a direct contractor and subcontractor, Pharmacia acted under color of federal office in manufacturing PCBs the U.S. military required for the national defense.

**B.      Pharmacia was acting under color of federal office when it manufactured PCBs pursuant to direct contracts with the federal government.**

Pharmacia also acted as a direct government contractor for the production of PCBs.  As shown in the Notice of Removal, Pharmacia manufactured PCBs under direct contracts with several agencies and departments of the federal government.  *See* Notice (Doc #1) at ¶¶ 5 and 10, and Notice Exs. B and D (Doc. #s 1-2 and 1-4).  Pharmacia sold PCBs directly to the Tennessee Valley Authority, U.S. Department of Agriculture, U.S. Government Printing Office, and the National Aeronautics & Space Administration ("NASA"), as well as the U.S. Army, U.S. Navy, and U.S. Air Force.  *See* Notice Ex. B (Doc. #1-2) (invoices reflecting PCB sales to federal government in the 1960s and 1970s).  Pharmacia also produced PCBs under direct contracts with the U.S. Atomic Energy Commission, for "use in certain applications critical to the national defense."  *See* Notice (Doc. #1) at ¶ 10, and Notice Ex. D (Doc. #1-4).   Additional invoices showing Pharmacia's direct sales of PCBs to the federal government are attached hereto as Exhibit Y.   As those invoices demonstrate, Pharmacia also sold PCBs directly to the Federal Aviation Agency and the U.S. Veterans Administration.  *See*, *e.g.*, Ex. Y at 22847, 22848, 22850, and 22861.

Several of the federal government agencies and departments that purchased PCBs directly from Pharmacia used them extensively.  The Tennessee Valley Authority, for example, purchased PCBs directly from Pharmacia, and used them widely.  *See* Notice Ex. B (Doc. #1-2) at 8, 9, 10.  By the mid-1970s, the Tennessee Valley Authority had over a million gallons of PCB-containing fluids in use on the TVA system.  *See* EPA, Industry Views on the Use of Polychlorinated Biphenyls in Transformers and Capacitors, 560/4-76-003, at 17-18 (June 1976) (Statement of John P. DeLong, Director, Power System Operations, TVA) (Ex Z).  The U.S.

military also used PCBs extensively and made direct purchases of PCBs from Pharmacia.  *See* Notice Ex. B (Doc. #1-2).

Pharmacia was acting under color of federal office when it produced PCBs under direct contracts with the government.  *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (defendant was "acting under" federal office where it "contracted with the Government to provide a product that the Government was using during war – a product that, in the absence of Defendants, the Government would have had to produce itself").  "A contractual mandate by the government can be a basis for satisfying the requirement that one has acted under the direction of a federal officer."  *Campbell v. Brook Trout Coal, LLC*, 2008 WL 4415078, at *5 (S.D. W.Va., Sept. 25, 2008).  Indeed, the lower federal courts repeatedly have held that a defendant acts "under color of federal office" when it manufactures items pursuant to a government contract. *See, e.g., Miller v. Diamond Shamrock*, 275 F.3d 414, 417-18 (5th Cir. 2001) (defendant acted under federal office when it produced Agent Orange for federal government); *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1178, 1181 (7th Cir. 2012) (defendant acted under federal office when it supplied asbestos-containing turbines to the Navy); *Akin v. Big Three Indus., Inc*., 851 F.Supp. 819, 823-24 (E.D. Tex. 1994) (defendant acted under federal office when it produced engines for the government), *removal aff'd* by *Akin v. Ashland Chem. Co*., 156 F.3d 1030 (10th Cir. 1998); *Pack v. AC and S, Inc*., 838 F.Supp. 1099, 1103 (D. Md. 1993) (defendant acted under federal office when it produced turbine generators containing asbestos cloth for the federal government).

Plaintiffs do not dispute that direct federal contractors qualify for removal.  *See* Pls.' Mem. Supp. Remand at 2 ("company generally must be a direct federal contractor to qualify for removal") (Doc #14).  Instead, they claim certain of Pharmacia's direct sales invoices, are not relevant to their claims, arguing that:  (1) "nearly half of the invoices are actually for *other*

- 13 -

*companies' products,*" *i.e.*, Inerteen and Pyranol, (2) one of the products sold, Pydraul, "was sold in both PCB-containing and non-PCB-containing formulations," and (3) "all or virtually all of the invoices[] relate to products sold for use in closed applications." *Id.* at 3-4.[7]

In fact, all of the invoices are relevant. First, the Interteen and Pyranol invoices are relevant because Pharmacia manufactured both of those products - and the PCBs they contained - for direct sale to the federal government.[8] Moreover, both Inerteen and Pyranol were formulated using Pharmacia's PCB-containing Aroclor products.[9] Thus, purchase orders from agencies of the federal government calling for Inerteen or Pyranol required the production of Pharmacia's PCB-containing Aroclor products.[10] Second, the Pydraul sales invoices are also relevant because the specific Pydraul products listed on those invoices (Pydraul 150 and Pydraul 625)[11] did

---

[7] According to an expert used by Plaintiffs' counsel in PCB litigation, Donna Vorhees, the two uses of PCBs that are considered "closed" are use in electrical capacitors and transformers. *See* Vorhees Aff., Ex. 2, at 2, Jan. 11, 2011 ("*Closed systems*:  electrical capacitors and transformers") (Ex. AA).  For open applications, "major uses included as a plasticizer in PVC, neoprene, and other chlorinated rubbers; other uses included surface coatings, paints, inks, adhesives, pesticide extenders, microencapsulation of dyes, carbonless copy paper…." *Id.* at 3.

[8] Inerteen and Pyranol were manufactured and sold by Pharmacia under licensing agreements with General Electric and Westinghouse, who owned the trade names for those products.  *See, e.g.,* 10/17/1950 License Agreement (granting license to produce dielectric fluids patented by General Electric) (Ex. BB); and 3/3/1965 letter from General Electric to Monsanto at 1 (identifying dielectric fluids referenced in 10/17/1950 license agreement as PYRANOL®) (Ex. CC).

[9] *See* U.S. EPA, Explanation of Significant Differences for the 1991 Record of Decision at the Westinghouse Superfund Site in Sunnyvale, California, SFUND RECORDS CTR 158111 (March 1997) at 1 ("Inerteen was the Westinghouse trade name for an askarel consisting of approximately 60 percent polychlorinated biphenyl (PCB, Aroclor 1260) and 40 percent trichlorobenzene (TCB).") (Ex. DD); *U.S. v. Gen. Elec. Co.*, 670 F.3d 377, 380 (1st Cir. 2012) (Pyranol was formulated using PCB-containing Aroclors manufactured by Pharmacia, then known as Monsanto Company.).

[10] Plaintiffs' argument that Pharmacia "disclaim[ed] any responsibility for Inerteen" in *Fisher* is incorrect. *See* Pls.' Mem. Supp. Remand at 3-4 (Doc #14).  Pharmacia acknowledged manufacture of the product and defended on the merits. *Fisher v. Monsanto Co.*, 863 F.Supp. 285 (W.D. Va. 1994).

[11] *See* Notice Ex. B (Doc. #1-2) at 3 (sale of Pydraul 150 to NASA), 4 (sale of Pydraul 625 to NASA), 8 (sale of Pydraul 150 to TVA), 9 (sale of Pydraul 625 to TVA), 10 (sale of Pydraul 150 to TVA).

contain PCBs.  *See* U.S. Dept. of Transp., U.S. Coast Guard, Commandant Instruction M16478.2

(Nov. 16, 1991) at 3-1 (Ex. EE) (Pydraul 150 and Pydraul 625 were PCB-containing hydraulic

fluids).  Third, sales of PCBs to the federal government for use in closed applications are

relevant, because Plaintiffs cannot establish that they were exposed only to PCBs used in non-

closed applications.  The exposure expert used by Plaintiffs' counsel in these cases, Dr. Donna

Vorhees, admits it is not possible to determine whether PCBs found in an individual's blood

were used in open or closed applications:

> Q:  You can't say with respect to PCBs that are in their body what
> the original application of those PCBs, whether it was transformer,
> capacitor, plasticizer; you can't identify that, correct?

> A:  Correct.

Vorhees Dep. at 75:10-14, Mar. 27, 2014 (Ex. FF).  In any event, several of the invoices reflect

sales for use in non-closed applications.  For example, certain invoices reflect Pharmacia's sale

of Aroclor 4465 to the U.S. Government Printing Office.[12]  Aroclor 4465 was used in printing

inks and the preparation of imitation gold leaf, both of which are non-closed uses.  *See*

Monsanto, Aroclor Plasticizers Technical Bulletin No. PL-306 (Dec. 1960) at 37 (Ex. GG).

Similarly, the Pydraul 150 and Pydraul 625 sold to the military were used as hydraulic fluids,

another non-closed application.  As shown above, Pharmacia also sold PCBs for a number of

open uses to the U.S. military and federal defense contractors.  Those include use in heat-

resistant paints, hull insulation and coatings, cellulosic lacquer, and cable coatings.  Pharmacia's

production of PCBs under direct contracts with the federal government is relevant to Plaintiffs

---

[12] *See* Notice Ex. B (Doc #1-2) at 12 (10/18/66 invoice for sale of Aroclor 4465 to U.S. Government
Printing Office).  *See also* Ex. Y at 22851, 22855, 22856, 22858, 22859, 22860, and 22872 (additional
invoices showing same).

claims and was "under color of federal office" for purposes of removal.  Plaintiffs' arguments to the contrary are without merit.

> **C.    Pharmacia's manufacture of PCBs for uses required by OSHA regulations was "under color of" federal office.**

Pharmacia also manufactured PCBs under color of federal office when it manufactured PCBs required by federal OSHA regulations.  In the 1970s, federal OSHA regulations required the use of PCBs in certain electrical applications for which the federal Interdepartmental Task Force (which included operating units of five Executive Branch departments) had determined continued use of PCBs was "necessary" to ensure the safety of the nation's power grid.  *See* Notice (Doc #1) at ¶ 9.  After 1971, Pharmacia manufactured PCBs exclusively for those uses deemed "necessary" and ultimately required by the federal government.  In so doing, it was acting under color of federal office.  *See Ruppel*, 701 F.3d at 1181 ("'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete.").  The Supreme Court has explained that private companies are "acting under" federal office when they "help[] the Government to produce an item that it needs."  *Watson*, 551 U.S. at 153.  *See also Isaacson*, 517 F.3d at 137 (company was acting under color of federal office when it produced "a product that, in the absence of Defendants, the Government would have had to produce itself").  The same reasoning applies here.

The government demanded the use of PCBs and it would have had to supply them if Pharmacia had not done so.  Here, the federal government needed PCBs so compliance with federal OSHA regulations designed to ensure the safety of the nation's electrical system would be possible. Pharmacia agreed to manufacture them until an acceptable alternative could be developed.  *See* Notice (Doc. #1) at ¶13 and Ex. G (Doc. #1-7).  Because Pharmacia's

manufacture of PCBs was necessary to make compliance with federal law possible, it was acting "under color of federal office" when it manufactured those PCBs.  *See Ruppel*, 701 F.3d at 1181 ("Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.").[13]

Plaintiffs do not deny that Pharmacia's manufacture of PCBs for uses required by federal OSHA regulations was "under color of federal office."  Instead, they contend that it is irrelevant to their claims, because they are based solely on PCBs manufactured for use in open applications.  Pls.' Mem. Supp. Remand (Doc #14) at 5 (asserting that "plaintiffs' claims do not arise out of such [closed] uses").  As shown above, Plaintiffs cannot identify the PCBs to which they were exposed.  Thus, the argument that their claims "do not arise out of" PCBs sold for use in closed applications" cannot be credited.  *See Isaacson*, 517 F.3d at 137 ("We credit Defendants' theory of the case when determining whether a causal connection exists.").  The first requirement for removal is satisfied.

## II.    Plaintiffs' Claims "Relate to" Actions Performed Under Color of Federal Office.

To satisfy the second requirement for removal under the statute, Pharmacia must show that Plaintiffs' claims are "for *or relating to*" Pharmacia's actions performed under color of federal office.  Plaintiffs' claims easily meet this requirement – their claims are "for or relating to" Pharmacia's production of PCBs.  In 2011, the language of the removal statute was amended to allow removal of cases that assert claims "for *or relating to* any act under color of such

---

[13] The fact that Pharmacia voluntarily manufactured some PCBs required by federal regulations does not take its conduct outside the removal statute.  *Isaacson*, 517 F.3d at 138 (it "makes little sense" to require that the relationship be coerced "in light of the statute's purpose" and because all "natural persons who are acting under a federal officer … are doing so voluntarily").

office." 28 U.S.C. § 1442(a)(1) (emphasis added).  This change was designed to broaden the

universe of cases that satisfy the "causal nexus" requirement for removal, as the Third Circuit

recently explained:

> Thus, before 2011, proponents of removal jurisdiction under § 1442 were required
> to "demonstrate that the acts for which they [we]re being sued" occurred at least
> in part "*because of* what they were asked to do by the Government." … In 2011,
> however, the statute was amended to encompass suits "for *or relating to* any act
> under color of [federal] office. …  Neither the Supreme Court nor any federal
> appellate court has addressed the significance of the insertion of the words "or
> relating to" in the statute.  However, the Supreme Court has defined the same
> words in the context of another statute:  "The ordinary meaning of the[] words
> ['relating to'] is a broad one – 'to stand in some relation; to have bearing or
> concern; to pertain; refer; to bring into association with or connection with.'" …
> Thus, we find that it is sufficient for there to be a "connection" or "association"
> between the act in question and the federal office.  Our understanding comports
> with the legislative history of the amendment to § 1442(a)(1), which shows that
> the addition of the words "or relating to" was intended to "broaden the universe of
> acts that enable Federal officers to remove to Federal court."

*In re Commonwealth's Motion,* 790 F.3d at 471-72 (internal citations omitted) (holding removal

was proper and reversing order granting remand).

Plaintiffs assert claims for exposure to PCBs used in "open" applications.  Yet, Plaintiffs

cannot determine the origin or application ("open" or "closed") of the PCBs to which they were

exposed.  Nonetheless, the factual record shows that U.S. government agencies used PCBs in

both open and closed applications.  Open uses included heat-resistant paints, lacquers, asphalt

compounds, and cable coatings.  Plaintiffs' claims easily meet the relaxed requirement that they

"stand in some relation" to actions Pharmacia performed under color of federal office – the

manufacture of PCBs.

As made clear by the 2011 amendments, Pharmacia is not required to establish that

Plaintiffs were exposed to the exact same PCBs that were manufactured at the behest of a federal

agency.  *In re Commonwealth's Motion*, 790 F.3d at 470 ("As discussed below, we disagree that

the [Defendant] is required to allege that the complained-of conduct *itself* was at the behest of a federal agency."). Where the plaintiff fails to identify the specific product of the defendant that allegedly caused his or her injury in the petition, removal is proper if the product could be one the defendant manufactured under color of federal office. *See*, *e.g., McCourt v. A.O. Smith Water Prods. Co*., 2014 WL 4627165, at *3 (D.N.J., Sept. 11, 2014); *Najolia v. Northrop Grumman Ship Sys., Inc*., 883 F.Supp.2d 646, 657 (E.D. La. 2012). *See also Isaacson*, 517 F.3d at 138 ("Indeed, whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal – not state courts to answer."). In fact, some courts have found removal untimely where the defendant waited to remove until discovery confirmed that the specific product causing the injury was one manufactured under color of federal office, where the allegations of the petition showed such a product might have been the cause. *See Gates v. A.O. Smith Water Prods. Co*., 2014 WL 104965, at *3 n. 2 (discussing that result in *Levy v. A.O. Smith Water Prods. Co*., 2012 WL 2878140 (S.D.N.Y., July 13, 2012). The second requirement for removal is satisfied.

## III.   Plaintiffs' Disclaimers Do Not Permit Remand.

In an effort to avoid removal, Plaintiffs included the following sentence in their Petition: "Plaintiffs affirmatively disclaim any damages or action arising under the constitution, treaties, or laws of the United States (including any claim arising from an act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office)." Pet. at ¶ 7 (Doc. #7). This disclaimer does not support remand. First, after the 2011 amendment, it is too narrow on its face to avoid removal, as it purports to disavow only claims "arising under," but not claims "relating to," acts performed under color of federal office. Second, federal courts routinely hold that such generic disclaimers are ineffective to

defeat federal jurisdiction, because they are circular.  *See, e.g., Shepherd v. Air & Liquid Sys. Corp.*, 2012 WL 5874781, at *2 (D.R.I., Nov. 20, 2012) ("Thus, asbestos plaintiffs' attempts to circumvent federal officer removal by the use of general disclaimers or other artful pleading tactics have generally failed.").  As one court explained:

> The plaintiff does not disclaim suit as to all exposure on Navy vessels but only those exposures which, in his own estimation, occurred as a result of a defendant's operation within the bounds of Section 1442(a), and the plaintiff stridently insists that none of the defendants fall within this section.  The disclaimer does not eliminate any question of federal officer removal but simply seeks to force this federal issue to be resolved in state court.

*Kite v. Bill Vann Co.*, 2011 WL 4499345, at *2 (S.D. Ala., Sept. 29, 2011).  *See also Marley v. Elliot Turbomachinery Co.*, 545 F.Supp.2d 1266, 1275 (S.D. Fla. 2008) ("Such a circular disclaimer would defeat the purpose of §1442(a)(1) as it would force federal contractors to prove in state court that they were acting under the direction of the government."); *In re Asbestos Prods. Liab. Litig.*, 770 F.Supp.2d 736, 742-43 (E.D. Pa. 2011) ("Recognizing this disclaimer would deprive the federal officer of the right to have the adequacy of the threshold determination, whether there is federal subject matter jurisdiction under the federal officer removal statute, made by a federal court.").[14]  Plaintiffs cannot both sue for the manufacture of PCBs, an act performed under color of federal office, and simultaneously disavow claims for such acts.  *See  Despres v. Ampco-Pittsburgh Corp.*, 577 F.Supp.2d 604, 608 (D. Conn. 2008) (rejecting similar disclaimer and noting, "Plaintiffs cannot have it both ways.").  Plaintiffs' disclaimer does not support remand.

---

[14] *See also Legendre v. Anco Insulations, Inc.*, 2012 WL 2064537, at *4 (M.D. La., May 14, 2012); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F.Supp.2d 51, 54 n.6 (D. Mass. 2008).

IV.    **Pharmacia's Federal Defenses Are Far More Than "Colorable"**

The only remaining requirement for removal is the assertion of a colorable federal defense.  Pharmacia asserts three federal defenses - the government contractor defense, express federal preemption, and implied federal preemption.  Removal is proper if the court finds any one of those defenses colorable.  *See Jacks*, 701 F.3d at 1235.  "[T]he court's job at this time is not to weigh and/or determine whether Defendants will ultimately prevail in establishing a federal defense."  *Leite v. Crane Co.*, 868 F. Supp. 2d 1023, 1041 (D. Haw. 2012).  Instead, the defense need only be "plausible."  *Ruppel*, 701 F.3d at 1182; *Jacks,* 701 F.3d at 1235.  All three federal defenses asserted here are more than "plausible."  Moreover, factual challenges to the sufficiency of the asserted federal defense do not support remand.  *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014) ("Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should "have the opportunity to present [his] version of the facts to a federal, not a state, court.") (quoting *Willingham*, 395 U.S. at 409).

A.    **Government Contractor Defense**

The government contractor defense applies when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."  *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988).  All three requirements are satisfied here.

First, all of the PCB mixtures Pharmacia manufactured for the federal government – Therminol, Pydraul, Pyranol, Interteen and the various Aroclors – all had precise chemical specifications and were approved for particular uses by the federal government.  *See, e.g.,* Fed. Spec. TT-P-28c (Ex. N) (government specification approving use of Aroclor 1254 in heat-

resistant paint); Notice (Doc #1) at ¶ 11 and Ex. E (Doc. #1-5) (government specified use of Aroclor 1242 in potting material for missiles); Notice Ex. B (Doc. #1-2) (invoices specifying purchase of Pydraul #150 for use as lubricant, Inerteen for use in transformers, and Pyranol for use in transformers).  As shown above, Pharmacia's various PCB-containing products were used by military contractors to meet exacting military specifications for a number of products.  *See supra* §I.A, and n. 2.  Not only did the government specify the exact PCB mixtures it required, the U.S. military required packing, packaging and marking in compliance with military specifications, MIL-STD-290C and Change Notices 1 and 3, for its PCB purchases.  *See* Notice (Doc. #1) at ¶12; and Notice Ex. B (Doc. #1-2) at 31, 32 (invoices for PCBs sold to military noting requirement of "[p]acking, packaging and markings in accordance with MIL-STD-290C and Change Notices 1 and 3.  Level of Pack C."); *see also id.* at 32 (government shipment to bear warning to avoid prolonged contact with skin).

Second, the various PCB mixtures manufactured by Pharmacia and sold to the federal government met all applicable product specifications, and satisfied government-required inspections.  *See, e.g.,* Ex. Y at 22866 (4/16/71 sales invoice to Loring Air Force Base, noting certification for national defense under DMS Reg L DOC9E, and contractor responsibility for performing inspections and tests required to substantiate that supplies and services provided under the contract meet military specifications); and at 22868 (4/1/71 sales invoice to Loring Air Force Base, noting same).  As noted above, Pharmacia received the Army-Navy "E" Award based, in part, on its satisfaction of government performance standards.  *See supra* at §I.A.

Third, Pharmacia was not aware of dangers of PCBs not known to the government.  *In re "Agent Orange" Product Liab. Litig.*, 304 F.Supp.2d 404, 435 (E.D.N.Y. 2004) ("The third prong does not require contractors to warn the government of dangers already known to the

government."). Still, Pharmacia did include warnings in its communications with the government regarding PCBs. Letter from W. Papageorge, Monsanto Company to J. Richards, U.S. Dept. of Commerce (Nov. 17, 1972) (Ex. V) (warning of environmental concerns; explaining need for care in handling, possession, use and disposal of PCBs; and noting food tolerance levels were being established). Pharmacia's government contractor defense is more than colorable.

## B. Federal Preemption Defenses

### 1. Express Preemption Under TSCA

Plaintiffs' claims are expressly preempted by the federal Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2617 (a)(2)(B). Congress passed Subchapter I of TSCA in 1976, to secure a comprehensive regulatory approach PCBs and new chemicals. Congress instructed EPA to balance the risks versus benefits of such chemicals—and to select among available avenues for regulation. *See*, *e.g.*, 15 U.S.C. § 2601(c) (EPA shall consider "environmental, economic and social impact[s]"); § 2605(a) (EPA shall select among appropriate regulatory measures that "protect adequately against such risk using the least burdensome requirements"), §2605 (c)(1)(D) (EPA shall consider the "reasonably ascertainable economic consequences" of any TSCA rule). For PCBs in particular, there was broad consensus that preexisting uses of PCBs were essential for the safety of the nation's electrical grid and to prevent catastrophic fires and explosions. Congress recognized a strong preemption clause was necessary - allowing contradictory state action could undermine the careful balancing Congress instructed EPA to perform, and thus would defeat Congress's purposes. *See, e.g., Rollins Envtl. Servs. (FS), Inc. v. Parish of St. James*, 775 F.2d 627, 633 (5th Cir. 1985) ("[t]o effectuate Congress' national regulatory objectives, Section 18(a)(2)(B) of TOSCA, codified at 15 U.S.C. § 2617, contains an explicit preemption provision.").

- 23 -

By its express terms, TSCA broadly prohibits states from "establish[ing] or continu[ing] in effect" "any requirement" "applicable to" PCBs, unless the requirement falls within a statutory exception.  15 U.S.C. §2617 (a)(2)(B).  Plaintiffs do not contend that the requirement their claims would impose fits any exception.  Several courts have found that TSCA preempts both state common law and statutory claims relating to PCBs.  *See, e.g., Rollins*, 775 F.2d 627 (TSCA preempted local ordinance that effectively prohibited disposal of PCBs in the parish); *Twitty v. North Carolina*, 527 F.Supp. 8778 (E.D. N.C. 1981) (nuisance action preempted by TSCA); *Warren County v. State of N.C.,* 528 F.Supp. 276 (D.C. N.C. 1981) (TSCA preempted county ordinance prohibiting disposal of PCBs in the county).  Thus, the defense is colorable.  *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007) ("[W]here the federal defense … had previously found success in other circuits, one would be hard pressed to say that the defense was not colorable.").

Plaintiffs' efforts to avoid the preemptive effect of TSCA fail.  First, Plaintiffs argue that TSCA cannot apply retroactively to bar their claims, asserting that their "claims arise entirely out of actions taken by defendants before TSCA was enacted."  Pls.' Mem. Supp. Remand (Doc #14) at 8.  The Petition does not so limit Plaintiffs claims, but such limitation would not avoid preemption for two reasons.  First, application of TSCA to claims that arose after its passage is not retroactive.  Here, all of Plaintiffs' exposures to PCBs occurring in the past approximately 38 years occurred *after* TSCA was enacted and, thus, their purported claims arose *after* TSCA was enacted.  Second, TSCA prohibits states not only from enacting new requirements applicable to PCBs, but also from "continu[ing] in effect" any requirements applicable to PCBs.  15 U.S.C. §2617 (a)(2)(B).  Thus, TSCA prohibits courts from continuing to give effect to any alleged state common law prohibition on the manufacture of PCBs that existed prior to its passage.

Plaintiffs next argue that the Citizens' Civil Actions provision of TSCA saves their claims from preemption.  It does not.  The provision authorizes citizens to commence a civil action against any person alleged to be in violation of TSCA, or against the Administrator to compel performance of duties under TSCA.  It provides that "*Nothing in this section*" – referring to the citizen suit section specifically and not the preemption provision which is in a different section – "*shall restrict* any right which any person … may have under any statute or common law to seek enforcement of this chapter or any rule or order under this chapter or to seek any other relief."  15 U.S.C. § 2619(c)(3) (emphases added).  This provision does not save Plaintiffs' claims.  As is clear, it addresses only *this section (§2619(c)(3))* of TSCA.  If it were intended to modify the separate preemption provision in §2617 (a)(2)(B), it would have included the phrase "nothing in this Act," "nothing in this Subchapter" or "nothing in this section or in section 2617(a)(2)(B)."

The U.S. Supreme Court examined similar text in the Clean Water Act's citizen suit provision in *International Paper Co v. Ouellette*, 479 U.S. 481 (1987).  The Court concluded that the savings provision *did not impact federal preemption of state law* because it "merely says that '[n]othing *in this section*,' *i.e.* the citizen suit provisions, shall affect an injured party's right to seek relief under state law; *it does not purport to preclude pre-emption of state law by other provisions of the Act*."  *Id*. at 493 (bolded emphasis added).  In fact, Plaintiffs' proposed interpretation of §2619(c)(3) must be rejected because it proves too much.  If it meant what Plaintiffs say, then no claims are preempted because the four word clause at the end of § 2619(c)(3) would take back the entire preemption provision in §2617, a construction the court must reject.

- 25 -

Plaintiffs' final argument to avoid TSCA preemption is that it preempts only "state requirements inconsistent with rules promulgated by the EPA." Pls.' Mem. Supp. Remand (Doc. #14) at 12. The statute plainly states otherwise. When the preemption provision is triggered, it prohibits states from "establish[ing] or continu[ing] in effect, *any requirement"* applicable to PCBs that is designed to protect against the risk of injury to health or the environment. *See* 15 U.S.C. § 2617 (a)(2)(B). The purported state law requirements Plaintiffs ask the Court to enforce here fall squarely within TSCA's preemptive reach.

## B.    Implied Preemption

Plaintiffs' claims also are barred by federal conflict preemption.  Plaintiffs assert a state law duty not to manufacture PCBs for use in open applications, which conflicts with federal directives requiring such production under the Defense Production Act, and federal government purchases of PCBs for open uses. The asserted state law duty would stand as an obstacle to the accomplishment of federal objectives. Thus, Plaintiffs' claims are barred by principles of conflict preemption. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (federal law overrides state law "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (quoting Hines v. Davidovitz, 312 U.S. 52, 67 (1941)); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (where Congress gives express sanction to an activity, the states cannot declare that activity tortious). Plaintiffs' argument that there is no conflict preemption because "it is obviously not impossible for defendant to pay damages" is without merit.  Pharmacia's implied conflict preemption is colorable and supports removal.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to remand should be denied.

Respectfully Submitted,

**THOMPSON COBURN LLP**

By: _____/s/ A. Elizabeth Blackwell_____

A. Elizabeth Blackwell #50270MO
John R. Musgrave #20358MO
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (telephone)
(314) 552-7000 (facsimile)
Email:  eblackwell@thompsoncoburn.com
Email:  jmusgrave@thompsoncoburn.com

**HUSCH BLACKWELL LLP**
Adam E. Miller #40945MO
Robyn D. Buck #51073 MO
190 Carondolet Plaza, Suite 600
St. Louis, MO 63105-3441
(314) 480-1500 (telephone)
(314) 480-1505 (facsimile)
Email: adam.miller@huschblackwell.com
Email: robyn.buck@huschblackwell.com

***Attorneys for Defendants***

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on February 4, 2016, the foregoing document was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.


       /s/ A. Elizabeth Blackwell