IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| THOMAS KELLY and MICHAEL KRZESZEWSKI, )<br>)<br>Plaintiffs )<br>v. )<br>)<br>MONSANTO CO., SOLUTIA, INC., and )<br>PHARMACIA LLC, )<br>)<br>Defendants ) | Cause No. 4:15-cv-01825-JMB<br><br>JURY TRIAL DEMANDED<br>ON ALL COUNTS |

**DEFENDANTS' SUR-REPLY IN OPPOSITION TO REMAND**

Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC ("Defendants"), respectfully submit this sur-reply to respond to new arguments raised for the first time in Plaintiffs' reply memorandum supporting their motion for remand ("Reply") (Doc. #30).

**I.    The liberal standards favoring federal officer removal apply even when the removing party is a private company.**

While Plaintiffs acknowledge that "many opinions state that federal officer removals are to be treated liberally," they incorrectly contend that, where a private company is the removing party, rather than a government official, the removal statute should be construed "narrowly." Reply at 1 (Doc. #30). For support, Plaintiffs rely on a footnote in *Freiberg v. Swinerton & Walberg Prop. Servs., Inc.,* 245 F. Supp. 2d 1144, 1152 n. 6 (D. Colo. 2002), and a case quoting *Freiberg*. Both the U.S. Court of Appeals for the Eighth Circuit and the U.S. Supreme Court have rejected that view, expressly holding that the words "acting under" – the very words that permit removal by a private company – are "broad" and must be "liberally construed." *See Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012) (holding that "'[t]he words "acting under" are broad,' and the Supreme Court 'has made clear that the statute must be "liberally construed"'" in reversing remand after federal officer removal by a private company) (quoting

*Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)). *See also Campbell v. Brook Trout Coal, LLC*, 2008 WL 4415078, at *6 n. 9 (S.D. W.Va., Sept. 25, 2008) (explaining that *Freiberg* is inconsistent with Supreme Court precedent, and that "[t]he words of § 1442(a)(1) afford no basis for a more narrow construction of the statue as applied to 'any person acting under' an agency or officer of the United States"). The statute's liberal construction applies regardless of who removes the case.

II.     **The 2011 amendments to the removal statute apply here.**

Prior to the 2011 amendments to the federal officer removal statute, a case was removable only where the plaintiff was suing "for" acts performed under color of federal office. But after the amendments, removal is proper where plaintiff's claims are either "for *or relating to*" such acts. In their reply, Plaintiffs incorrectly contend that the 2011 amendments have "no bearing on the present case" because the legislative history shows that the amendment "was … addressed to one particular problem," "an inter- and intra-circuit split as to whether State 'pre-suit discovery' laws qualify as civil actions …that are removable under §1442." Reply at 8, 7 (Doc. #30). Plaintiffs are incorrect. While it is true that the 2011 amendments added a new section, §1442(d)(1), to address pre-suit discovery proceedings, that is not all they did. As the legislative history's "Section-by-Section Analysis" explains, they also revised the language of an existing section, §1442(a)(1), with the *expressed intent* of broadening the right to remove:

> **Sec. 2.  Removal of Certain Litigation to Federal Courts.  Section 2(a)** of H.R. 368 amends 28 U.S.C. §1442 by specifying that "civil action" and "criminal prosecution" include "any proceeding in which a judicial order, including a subpoena for testimony or documents is sought or issued." The bill clarifies that a civil action "commenced" in State court includes …those "directed to" a Federal officer (which presumably covers discovery proceedings). …
>
> **Section 2(b)** rewrites §1442 by permitting removal by Federal officers "in an official or individual capacity*, for *or relating to* any act under color" of their

office.  *This is intended to broaden the universe of acts that enable Federal officers to remove to federal court*.

Reply, Ex. E at 7 (Doc, #30-5) (H.R. Rep. 112-17(I) (2011)) (emphases added).  *See also In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 467 (3d Cir. 2015) (the 2011 Act "made two amendments to §1442 that are relevant here.  First, the Act clarified that the term 'civil action' includes ancillary proceedings ….  Second, it added the words 'or relating to' after 'for' in §1442(a).").

Thus, the legislative history does not support Plaintiffs' view.  *See Garcia v. U.S.*, 469 U.S. 70, 75 (1984) ("[O]nly the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language.").  And, because the statutory language is unambiguous, Plaintiffs' appeal to legislative history is inappropriate, in any event.  *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808 n.3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.").  The Court should apply the plain language of the statute, as amended, with the relaxed nexus requirement.

**III.     All PCBs Pharmacia manufactured under color of federal office – whether for open or closed use - are relevant to the Court's analysis.**

Plaintiffs' Reply repeatedly argues that Pharmacia's manufacture of PCBs for *closed* uses should be disregarded because, according to Plaintiffs, their claims are based on exposure to PCBs sold for *open* uses.  Reply at 3-5, 10 (Doc. #30).  Yet, in their reply brief, Plaintiffs admit that "it is impossible to determine whether PCBs in a given person's body emanated from open or closed applications."  *See* Reply at 5 (Doc. #30).

Despite this concession, Plaintiffs urge the Court to assume their exposures were to open use PCBs, because they contend "99% of all environmental PCB exposure – the alleged exposure at issue in this case – comes from open applications."  *Id*.  Plaintiffs are simply

incorrect. In 1976, EPA estimated that, of the 440 million pounds of PCBs that were "in the environment," at least 190 million pounds (or 43%) came from capacitor and transformer production wastes and obsolete electrical equipment in landfills and dumps. *See* EPA, PCBs in the United States Industrial Use and Environmental Distribution ("EPA PCB Report") at 5, 7, and Table 1.2-1 (Feb. 25, 1976) (Ex. A). Capacitors and transformers are closed applications.

The only support Plaintiffs offer for their argument is a 1972 document written by E.R. Boquist, whose calculations are flawed. Reply, Ex. C (Doc. #30-3). As the document reveals, Mr. Boquist's 99% calculation was based on his surmise that "the maximum amount of leakage that could be expected from continuing use of Aroclors in closed electrical systems would be 0.03% or 9,000 lbs. per year…." *Id.* at 13. Mr. Boquist, whose qualifications, if any, are not shown, provides no citation for this figure, and it is a gross underestimation of the total amount of PCBs entering the environment each year from closed applications. In 1976, EPA reported that 9.6 million pounds of PCBs were "land-disposed" each year as a result of the production and use of PCBs in closed applications. *See* EPA PCB Report at 292 (Ex. A).[1] As EPA explained: "[T]he current estimated yearly rate of PCBs entering land disposal sites is about 12 million pounds. The largest source of this material is capacitors which have failed or become obsolete, or which are contained in obsolete equipment." *Id.* at 8. The capacitor industries alone generated over 3 million pounds of PCB waste annually, much of which previously "was not disposed of properly and thus entered the environment directly." *Id.* at 11. Mr. Boquist also assumed that 100% of PCBs used in open applications were released into the environment. *See*

---

[1] EPA estimated that 2.4 million pounds of PCBs were land disposed annually as a result of PCB production and transformer and capacitor use, another 4.5 million pounds of PCBs enter landfills each year due to failure of PCB-impregnated capacitors, and another 2.7 million pounds enter landfills each year from capacitors that have not failed but are contained in obsolete equipment.

Reply, Ex. C at 11-12 (Doc. #30-3). That assumption is also incorrect. *See, e.g.,* Trial Tr., *Smith v. Monsanto Co.,* 4051:22-4052:18, Oct. 1, 2015 (defense expert Dr. Reitman testifying that, 40 years after use, most PCBs still remain in caulk, an open application) (Ex. B).

Even if Mr. Boquist's analysis had been accurate in 1972, it would be irrelevant now – 44 years later – as the relative importance of different sources of PCB emissions has changed over time. As recent studies explain, "there has been a shift in the relative importance of emissions attributed to usage, from open sources to closed systems. This is caused by the cessation of open usage and longer product lifetime for closed systems." Breivik, K., et al., *Toward a global historical emission inventory for selected PCB congeners – a mass balance approach 2. Emissions*, The Science of the Total Environment 290: 199-224, 216 (2002) (Ex. C). Indeed, in 1982, EPA estimated that 503,680 pounds of PCBs continued to be lost to the environment from closed systems each year, but that emissions from open applications had "effectively been halted." EPA, EPA-450/4-84-007n, Locating and Estimating Air Emissions from Sources of Polychlorinated Biphenyls (PCBs) at 58, 28 (May 1987) (Ex. D).

Regardless of the factual assertions of Plaintiffs, because it is impossible to determine whether the PCBs allegedly causing Plaintiffs' injuries were released from open or closed applications, both are relevant to the Court's analysis.

**IV.    Pharmacia had direct contracts with the federal government for the manufacture of PCBs, including the manufacture of PCBs for open uses.**

Plaintiffs also argue, for the first time in their reply brief, that Pharmacia "had no actual contracts with the Government." Reply at 4. (Doc. #30) [2] Plaintiffs' argument is factually

---

[2] Defendants previously responded to the argument that subcontractors cannot act under color of federal office, and will not repeat that response here. *See* Defs.' Opp. to Pls.' Mot. for Remand ("Opp.") at 11 (Doc. #23). *See also Campbell*, 2008 WL 4415078, at *6 (addressing nexus requirement).

incorrect. Documents previously submitted to the Court show that Pharmacia had many direct contracts with the federal government for the manufacture of PCBs. *See* Notice of Removal ("Notice"), Ex. B (Doc. #1-2) (collection of invoices showing direct purchases of PCBs by the federal government in the 1960s and 1970s); Notice, Ex. D (Doc. 1-4) (direct contract for sale of PCBs to U.S. Atomic Energy Commission); Opp., Ex. Y (Doc. 23-25) (collection of invoices showing additional direct purchases of PCBs by the federal government in the 1960s and 1970s). While certain documents provided by Pharmacia note that the company did not have direct government contracts during certain points in the 1940s, those documents do not address later time periods during which Pharmacia has demonstrated it did have such contracts.

In fact, later in their reply, Plaintiffs acknowledge that Pharmacia made direct sales of PCBs to the federal government, but contend that the "examples primarily concern the Tennessee Valley Authority" and that "[s]uch sales would have been for … closed uses." Reply at 4-5 (Doc. #30). Plaintiffs are wrong on both points. First, less than 10 percent of the sales invoices provided to the court reflect sales to TVA. *See* Notice, Ex. B (Doc #1-2); Opp., Ex. Y (Doc. #23-25). The dozens of other invoices provided reflect direct sales of PCBs to the U.S. Navy, U.S. Air Force, U.S. Army, U.S. Printing Office, National Aeronautics & Space Administration (NASA), and other federal government departments and agencies. Second, the TVA invoices provided are all for sales of Pydraul,[3] a PCB-containing hydraulic fluid,[4] which Plaintiffs consider an open use. *See* Pls' Reply, Ex. C at 12 (Doc. #30-3) ("231 million pounds [of PCBs]

---

[3] *See* Opp., Ex. Y at 17 (Doc. #23-25) (invoice for direct sale of 540 gallons of Pydraul to TVA); Notice, Ex. B. at 8 (Doc. #1-2) (invoice for direct sale of 162 gallons of Pydraul to TVA), 9 (invoice for direct sale of 540 gallons of Pydraul to TVA), 10 (invoice for direct sale of 165 gallons of Pydraul to TVA).

[4] *See* Opp., Ex. EE at 13 (Doc. #23-31).

have been used in products that may be classified as open systems, *i.e.* paint formulations, plasticizers, *hydraulic fluids*, and semi-closed systems such as heat exchangers") (emphasis added). Thus, invoices showing direct sales of Pydraul to TVA and other federal government agencies demonstrate that Pharmacia sold PCBs to the federal government for uses Plaintiffs consider open applications. In fact, several other invoices also reflect direct sales of PCBs to the federal government for use in open applications. *See* Opp. at 15 (Doc. #23) (citing examples).[5]

## V. The federal government also ordered Pharmacia, pursuant to the Defense Production Act, to sell PCBs to defense contractors for open applications.

Plaintiffs also argue that the PCB sales the federal government directed Pharmacia to make to defense contractors in the 1970s, pursuant to the Defense Production Act, were not for open use. Reply at 4 (Doc. #30) (claiming "the one example given says nothing about open uses" and citing exhibit W). Plaintiffs point to *Exhibit W* to support their argument, but it is actually *Exhibits T, U and V* that demonstrate that the sales Pharmacia was being ordered to make were for PCBs to be used in open applications.

As shown in Exhibit T, Pharmacia voluntarily stopped selling PCBs for use in open applications in 1971. *See* Opp., Ex. T (Doc. #23-20) at 8 ("by mid-1971, the Monsanto Industrial Chemicals Co., the sole U.S. producer, had voluntarily terminated sales…for all but closed electrical systems uses"). Exhibit U shows that, in November 1972, the government directed Pharmacia to sell 3,000 pounds of Aroclor #1242 to defense contractor Emerson and Cuming, Inc. Opp., Ex. U (Doc. #23-21). Pharmacia's response, Exhibit V, makes clear that it had refused the order because it was an order for PCBs to be used in open applications:

---

[5] Plaintiffs also submitted briefing and the affidavit of Monsanto employee William Papageorge from the *Fisher* case to show that Westinghouse developed Interteen, not Monsanto. Reply at 2-3 (Doc. #30). The point is irrelevant. Pharmacia manufactured Interteen and the PCB-containing Aroclors that it included under direct contracts with the federal government.

> As you are aware, because of the increasing environmental concerns expressed about products containing polychlorinated biphenyls (PCBs), [Pharmacia] no longer sells Aroclor 1242 for the uses which we understand Emerson and Cuming, Inc. intend for the Aroclor 1242 we have been directed to deliver. This discontinuance of sales for this type of application is a part of a policy voluntarily established by [Pharmacia] and which has had the approval of various branches of the United States Government, including the U.S. Department of Commerce. We, therefore, respectfully question the wisdom of your directing us to sell this material when, as we understand it, alternate acceptable materials are available for the use to which our Aroclor 1242 is to be put.

Opp., Ex. V (Doc. #23-22). The Exhibit cited by Plaintiffs, Exhibit W, is simply another example of the federal government directing Pharmacia to sell PCBs to defense contractors, after Pharmacia had voluntarily terminated sales for open applications.

**VI.   Pharmacia's manufacture of PCBs to meet OSHA requirements supports removal.**

Plaintiffs now argue for the first time that Pharmacia's manufacture of PCBs for use in closed electrical systems in the 1970s was not under color of federal office, because the "Task Force Report did not require [Pharmacia], or anyone else, to do or not do anything." Reply at 10 (Doc. #30). In fact, a private company's actions need not be "required" by the government to be under color of federal office. *See Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (it "makes little sense" to require that the relationship be coerced because all "natural persons who are acting under a federal officer … are doing so voluntarily"). Moreover, Plaintiffs' argument regarding the Task Force report is a red herring. Regardless of what the Task Force report did or did not require, Plaintiffs have not disputed that *federal OSHA regulations* did require the use of PCBs in certain applications (and, thus, their manufacture).

Moreover, the cases cited by Plaintiffs to support their argument regarding the Task Force Report – a group of cases decided before the 2011 amendments – are inapposite for several reasons. First, in each case, the Plaintiffs' claims were based on Pharmacia's alleged *improper disposal*, not *manufacture*, of PCBs. Thus, whether Pharmacia was acting under color of federal

office in manufacturing PCBs was not before the court. *See Anderson v. Hackett,* 646 F. Supp. 2d 1041, 1054 (S.D. Ill. 2009) ("[O]nce again, the Monsanto Defendants are not being sued for producing PCBs, but for mishandling PCBs.  The Monsanto Defendants have pointed to no federal direction as to how they were to handle the PCBs they produced."); *Custer v. Cerro Flow Prods., Inc.*, 2009 WL 5033931, at *7 (S.D. Ill., Dec. 15, 2009) (same); *Mobley v. Cerro Flow Prods., Inc.,* 2010 WL 55906, at *6 (S.D. Ill., Jan. 5, 2010) ("[T]he record before this Court does not demonstrate the government's necessary control over the method of waste disposal."); *Brown v. Cerro Flow Prods., Inc.*, 2010 WL 55905 at *7 (S.D. Ill., Jan. 4, 2010) (same). Statements in those cases suggesting Monsanto did not *manufacture* PCBs under federal office are *dicta*.

Second, like Plaintiffs, the district court deciding those cases misconstrued the "acting under" standard, holding that a defendant does not "act under" color of federal office unless the government "ordered" or coerced the action. *See, e.g., Custer*, 2009 WL 5033931, at *7 ("[N]one of the evidence submitted … shows the federal government ordered the Defendants to continue the production of PCBs…").  As shown above, that is not the standard. *See Isaacson*, 517 F.3d at 138.

Third, Plaintiffs' contention that, in those cases, "[Pharmacia] made the same arguments it does here about federal officer jurisdiction," is simply incorrect. *See* Reply at 10 (Doc. #30). In those cases Pharmacia did not raise the OSHA regulations requiring the use (and, thus, manufacture) of PCBs.

Finally, in those cases the court improperly construed the removal statute "narrowly" in favor of remand (because the removing party was a private corporation), instead of construing it broadly in favor of removal.  *See Brown*, 2010 WL 55905, at *3; *Mobley,* 2010 WL 55906, at *3. As shown above, the statute is to be construed liberally.

### VII. Pharmacia's production of PCBs under federal office was not *de minimis*.

Even though there is no quantity requirement under the removal statute, Plaintiffs repeatedly claim that Pharmacia's production of PCBs for the federal government was "*de minimis*." Reply at 5-6, 11 (Doc. #30). Pharmacia responds to the argument, not because it is relevant to the Court's decision, but simply to correct the record. While Pharmacia does not have complete sales records for the entire period during which it sold PCBs – 1939 to 1977 – its records show that a significant volume of PCBs was manufactured under federal office. For example, all PCBs manufactured from 1972-1977 were manufactured under color of federal office. *See* Opp. at 16-17 (Doc. #23). During that period, Pharmacia produced approximately 40 million pounds of PCBs per year - over 225 million pounds of PCBs. *See* EPA PCB Report at 200, Table 1.1-2 (in 1972, Pharmacia manufactured 38.6 million pounds of PCBs; in 1973, it manufactured 42.1 million pounds; in 1974, it manufactured 40.5 million pounds) (Ex. A); Technical Factsheet on: Polychlorinated Biphenyls (PCBs) at 1 (in 1977, Pharmacia manufactured 35 million pounds of PCBs) (Ex. E). During the period leading up to World War II, Pharmacia was producing at least 600,000 pounds of Aroclors for defense purposes each month – roughly 7.2 million pounds per year. *See* Opp. at 6 (Doc. #23) (citing Application of Necessity Certificate that noted that 100% of the 600,000 pounds/month increase in Aroclor production would be "for Defense purposes"). Invoices previously provided reflect consistent direct sales of PCBs to the federal government during the 1960s and early 1970s as well.

### Conclusion

For the reasons stated in Defendants' opposition brief, and the additional reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion for remand.

Respectfully Submitted,

**THOMPSON COBURN LLP**

By:     /s/ A. Elizabeth Blackwell

A. Elizabeth Blackwell #50270MO
John R. Musgrave #20358MO
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (telephone)
(314) 552-7000 (facsimile)
Email: eblackwell@thompsoncoburn.com
Email: jmusgrave@thompsoncoburn.com

**HUSCH BLACKWELL LLP**
Adam E. Miller #40945MO
Robyn D. Buck #51073 MO
190 Carondolet Plaza, Suite 600
St. Louis, MO 63105-3441
(314) 480-1500 (telephone)
(314) 480-1505 (facsimile)
Email: adam.miller@huschblackwell.com
Email: robyn.buck@huschblackwell.com

*Attorneys for Defendants*

- 11 -

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 21, 2016, the foregoing document was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

                                           /s/ A. Elizabeth Blackwell