| | |
|---|---|
| THOMAS KELLY and | ) |
| MICHAEL KRZESZEWSKI, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  No.  4:15 CV 1825 JMB |
| | ) |
| MONSANTO COMPANY, SOLUTIA INC., and | ) |
| PHARMACIA, LLC,[1] | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before this Court on Plaintiffs Thomas Kelly and Michael Krzeszewski's

Motion to Remand this action to state court.   (ECF No. 13)   Defendants Monsanto Company,

Solutia, Inc., and Pharmacia, LLC (collectively "Defendants") oppose the motion, and the issues

are fully briefed.   The parties consented to the jurisdiction of the undersigned pursuant to 28

U.S.C. § 636(c).   As in the related case before the Honorable Audrey G. Fleissig, United States

District Judge, the undersigned will remand this case to state court due to lack of federal officer

jurisdiction.   See Bailey, et al. v. Monsanto Company, et al., Cause Number 4:15 cv 844 AGF,

2016 WL 1258636 (E.D. Mo. Mar. 31, 2016).

On November 9, 2015, Plaintiffs filed a Petition in the Circuit Court of the Twenty-First

Judicial Circuit, St. Louis County, Missouri.   Plaintiffs allege two state tort law claims,

---

[1]Plaintiffs' Petition names Pharmacia Corporation as a defendant.   As of November 30, 2012, the
entity converted to an LLC so Pharmacia Corporation does not exist.   Accordingly, as indicated in
the hearing on April 28, 2016, the undersigned will change the defendant's name to Pharmacia,
LLC.

negligence and strict liability for design defect, relating to polychlorinated biphenyls ("PCBs")[2] sold by Monsanto. Plaintiffs have specifically limited their claims to a subset of PCBs, namely those sold for so-called "open applications."[3] Plaintiffs allege they developed non-Hodgkin's lymphoma ("NHL") as a result of their dietary and environmental exposure to PCBs manufactured and sold by "Old Monsanto," a company that, as of 2000, ceased to exist. (ECF No. 1-9, Petition at ¶ 8) Plaintiffs' theory of liability is premised on their exposure to such PCBs that over decades, accumulated and persisted in the environment and food chain. Plaintiffs also state that they "affirmatively disclaim" any damages or actions arising out of an act of the United States or of any federal officer. In relevant part, Plaintiffs assert that "Monsanto's PCBs have contaminated the food chain and continue to be ubiquitous contaminants of the air, water, and soil, all Americans, including Plaintiffs, have been substantially exposed to Monsanto's PCBs sold for open and non-controllable applications, through diet and other environmental exposures." (Id at ¶ 17) Plaintiffs assert that all three Defendants collectively have legal responsibility for Old Monsanto's production of PCBs.

## I. **Factual Background**

For purposes of the motion now before the Court, the record as set forth in the Petition establishes the following facts. From 1929 until 1977, when Congress banned the manufacture of

---

[2]PCBs are a class of man-made organic compounds that are nonflammable and conduct heat without conducting electricity, and have been used in many different products, including electrical equipment, to prevent fires and explosions.

[3]Open applications are applications in which the PCBs are unrecoverable or consumed during the use. Examples of open system applications include paints, carbonless paper, lubricating oils, inks, laminating and impregnating agents, adhesives, waxes, additives in cement, casting agents, sealing liquids, fire retardants, immersion oils, pesticide extenders, caulking compounds, hydraulic fluids, and plasticizers. In contrast, closed applications are applications in which the PCBs were normally contained within the electrical equipment or machinery. Examples of closed applications include transformers and capacitors. (Petition ECF No. 1-9 at ¶ 15)

PCBs, Old Monsanto (and its predecessor in interest) produced and sold more than 99 percent of all PCBs used in the United States. Old Monsanto sold those PCBs as liquid mixtures, under the trade name "Aroclor," to numerous industrial customers, for a wide variety of industrial uses. By the late 1930s it was known that PCBs were systemically toxic to humans, and by the late 1960s that PCBs were accumulating in the environment and food chain. In the early 1970s, Old Monsanto ceased manufacturing PCBs for open applications and limited their manufacture to closed applications-insulating fluid in transformers and capacitors. In August 1977, Old Monsanto stopped all manufacture of PCBs. (Id. at ¶¶ 14, 18)

From 1901 to 1997, Old Monsanto manufactured a variety of chemicals and agricultural products, including PCBs. This original Monsanto corporate entity ceased to exist in 1997 as the result of a series of corporate spin-offs and acquisitions. At that time, Old Monsanto's chemical division was split-off into a newly-independent corporation, which was named Solutia, Inc. ("Solutia"). As part of this 1997 spin-off, Solutia assumed certain of Old Monsanto's debts and liabilities, including all liabilities related to Old Monsanto's production and sale of PCBs. (Id. at ¶ 9)

In 2000, the remaining portion of Old Monsanto merged with Pharmacia/Upjohn Corporation ("Pharmacia"). Pharmacia then incorporated a new company in Delaware, also called "Monsanto Co.," which is now referred to as "New Monsanto." In 2003, Pharmacia was acquired by Pfizer, Inc. ("Pfizer"). In 2012, Pharmacia merged with another Pfizer subsidiary, and the surviving corporation, was renamed as Pharmacia, LLC, on November 30, 2012. As part of Solutia's federal bankruptcy plan of reorganization, New Monsanto agreed to indemnify Solutia for all tort "legacy liabilities" related to Old Monsanto's activities, including the production and

sale of PCBs.

Plaintiffs assert in the Petition that as a result of these various transactions, Defendants Pharmacia, Solutia, and Monsanto, collectively have legal responsibility for Old Monsanto's conduct in the production, sale, and distribution of PCBs.   (Id. at ¶¶ 10, 12-13)   As noted above, Plaintiffs assert two Missouri state law claims:   strict liability for design defect and negligence. Plaintiffs limit these claims to only Monsanto's various PCBs products sold for open applications. Plaintiffs also "affirmatively disclaim" any damages or action arising out of an act of the United States or of any federal officer.   (Id. at ¶ 7)

## II.  Federal Officer Removal

On December 10, 2015, Pharmacia, with the consent of Monsanto and Solutia, removed the case to this Court, pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), alleging that the production of the PCBs was done at the request and under the direction of the federal government.   Defendants also assert two colorable federal defenses:   the government contractor defense and federal preemption.

Section 1442(a)(1) allows the removal of cases directed against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office...."

Section 1442 states:

(a)   A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1)   The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or

on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). Section 1442(a)(1) "grants independent jurisdictional grounds over cases involving federal officers where a district court otherwise would not have jurisdiction." Johnson v. Showers, 747 F.2d 1228, 1229 (8th Cir. 1984) (quotation omitted).

Congress enacted the federal officer removal statute, 28 U.S.C. § 1442(a)(1), "'to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arres[t]' and bring 'to trial in a State cour[t] for an alleged offense against the law of the State,' 'officers and agents' of the Federal Government 'acting ... within the scope of their authority.'" Watson v. Phillip Morris Co., Inc., 551 U.S. 142, 150 (2007) (quoting Willingham v. Morgan, 395 U.S. 402, 406 (1969)). Section 1442(a)(1) is not "narrow or limited," and Congress' decision to permit federal officers, and those acting under their direction, to litigate their federal defenses in federal court "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." Willingham, 395 U.S. 406-07 (internal quotation marks omitted).

A notice of removal should provide the jurisdictional facts supporting removal under § 1442(a). A defendant seeking removal under § 1442(a) must provide "candid, specific and positive" facts in his notice of removal showing that a plaintiff's claims are based on its conduct as a federal officer. See Willingham, 395 U.S. at 408. Courts may consider documents submitted after the notice of removal, including those attached to the subsequent motions, when appropriate. Id. at 407 n.3.

## A.  Notice of Removal

Pharmacia bases its federal officer removal on the following facts set forth in its Notice of Removal.   (ECF No. 1)   In 1971, the federal government convened an Interdepartmental Task Force[4] ("Task Force") to assess the risks associated with PCBs and "to strengthen the Government's ability to protect the public from actual and potential hazards from PCBs."   (ECF No. 1-3 at 4)   The Task Force produced a 1972 Report "detailing current knowledge about various aspects of PCBs, including their use and replaceability; occurrence ... in the environment ...; and PCBs effects on man and animals."   (Id. at 3)   The Task Force concluded that continued use of PCBs in certain applications remained necessary and that there were no present or prospective substitutes for PCBs, thus the use of PCBs should not be banned entirely.    In relevant part, the Task Force found that "[PCBs] continued use for transformers and capacitors in the near future is considered necessary because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use."   (Id. at 7)[5] Recognizing no present or prospective substitutes for PCBs and the functions PCBs perform to be essential, the Task Force found there to be a continued need for PCBs in closed electrical system applications in order to avoid disruption of electrical service.   (Id. at 7, 14)

In February 1972, the United States Department of Labor, Occupational Safety & Health Administration ("OSHA") adopted electrical standards that required the use of PCBs in a number of applications.   See Electrical Standards, 72 Fed. Reg., 7,136 (Feb. 14, 2007) (to be codified at 29 C.F.R., pt. 1910); Application of Certain Electrical Standards, 37 Fed. Reg., 3,431 (Feb. 16,

---

[4]The Task Force included five Executive Branch Departments:   Department of Agriculture, Department of Commerce, Environmental Protection Agency, Department of Health, Education, and Welfare, and the Department of the Interior.

[5]As noted above, transformers and capacitors reflect closed applications.

1972) (to be codified at 29 C.F.R., pt. 1910).

In 1976, Congress passed the Toxic Substance Control Act ("TSCA"), and delegated to the Environmental Protection Agency ("EPA") the power to promulgate a comprehensive regulatory scheme governing the manufacture, use, distribution, disposal, and remediation of a wide range of chemicals in the United States, including PCBs. 15 U.S.C. §§ 2601-2629. Congress specifically authorized the continued manufacture of PCBs until January 1, 1979, in recognition that the continued use of PCBs remained necessary in certain applications including electrical applications in closed systems. Id. at § 2605(e)(3)(A)(I).

According to Pharmacia, the United States government directed Old Monsanto to continue to sell PCBs during this time period to fulfill military defense needs despite Old Monsanto's warnings about potential hazards associated with PCBs. For example, in the 1970s, Monsanto produced heat transfer fluids containing PCBs for the United States Atomic Energy Commission ("USAEC") because it determined their "use in certain applications [was] critical to the national defense" and that "acceptable substitutes [were] not presently available." (ECF No. 1-4)[6]

Pharmacia next asserts that Old Monsanto also manufactured and sold PCBs to government contractors "at the direction of the government." As an example, Pharmacia submits a 1973 telex from Raytheon Company to Old Monsanto reflecting the government's role in directing the manufacture and sale of Aroclor 1242. (ECF No. 1-5)[7] Pharmacia also asserts

---

[6]This exhibit, the Special Undertaking for Future Purchases of Polychlorinated Biphenyls Contained in Therminol FR-1 (a Trade Name of Monsanto Company) dated March 28, 1972, shows an intended future sale of 400 barrels of PCBs to USAEC and Bendix Corporation as a joint buyer. (ECF No. 1-4)

[7]In relevant part, the telex provides:

> We wish at this time to state that this is not the normal course in which Raytheon does business. We make these concessions and agreements only to obtain your

that in the 1970s, the Department of Defense and other federal agencies had procurement

specifications for the purchase of PCBs and materials containing PCBs.   Therefore, Pharmacia

contends that although Old Monsanto voluntarily ceased the sale of PCBs for open applications by

1972, Old Monsanto continued manufacture and sale of PCBs through the mid-1970s for uses

requested by governmental agencies and federal law.[8]

### B. Motion for Remand and Responsive Briefs Thereto

On January 11, 2016, Plaintiffs filed a Motion to Remand arguing that Old Monsanto was

not acting under a federal officer within the meaning of § 1442(a)(1) when it manufactured PCBs,

and there is no causal connection between Old Monsanto's actions and official authority, as

required for federal officer removal.   According to Plaintiffs, Old Monsanto was not a

government contractor and so was not acting under a federal officer within the meaning of

§ 1442; there is no causal connection between Defendants' actions and any official authority

exercised by the government with regard to PCBs; and Old Monsanto lacks a colorable federal

defense.   Plaintiffs contend that their claims concern only Old Monsanto's manufacture and sale

of PCBs for open uses, so any evidence relating to products sold for use in closed applications is

largely irrelevant.   According to Plaintiffs, Old Monsanto's colorable defense based on TSCA

preemption is meritless as evidenced by the fact that such a defense has never been raised, much

---

agreement promptly to ship Aroclor 1242 and because the government has directed
us to proceed to manufacture missiles but has refused to authorize Raytheon to
qualify a new potting material which would avoid use of Aroclor 1242.   We also
wish to acknowledge the fact that Monsanto in all of our dealings has expressed a
strong preference not to sell this product to us and is proceeding with the sale only
at the direction of the government and because we have made the concessions
outlined above.

(ECF No. 1-5 at 4)

[8]It appears that all of these PCBs were for closed applications.

less successfully, in the years of PCB litigation against Old Monsanto. Further, Plaintiffs contend the defense is unavailable here inasmuch as the TSCA became effective in 1977, and Plaintiffs are challenging conduct that occurred before its enactment. Plaintiffs also argue that the TSCA savings clause preserves their state tort claims seeking damages.

In response, Defendants argue that, for federal officer removal, a liberal standard applies. Defendants rely on the facts, that, from 1929 to 1977, Old Monsanto manufactured PCBs directly for use by the federal government to meet the nation's military needs and to maintain the safety of the nation's power grid, and federal OSHA regulations required their use. Defendants argue that, as a result, Plaintiffs' claims challenge Old Monsanto's conduct performed under color of federal office. Defendants contend that the sales of PCBs to the federal government for use in closed applications are relevant, even though in the Petition Plaintiffs seek to limit their basis of exposure to open applications, because it is not possible to determine to which PCBs Plaintiffs were exposed. Finally, Defendants contend that courts have routinely denied requests for remand based on generic disclaimers.

In their reply, Plaintiffs maintain that the federal removal statute is not read liberally where only the liability of a private company purportedly acting at the direction of a federal officer is at issue. Plaintiffs argue that the evidence submitted by Defendants "overwhelmingly concern either PCBs that Old Monsanto was producing, not for sale to the Government, but to other companies, or products used in closed applications only." (ECF No. 30 at 3-4) Finally, Plaintiffs contend that even indulging all inferences in Defendants' favor, "the amount of sales of PCBs to the government that are in any way relevant to this case is *de minimis.*" (Id. at 5) Plaintiffs emphasize that their Petition is based on the manufacture of PCBs for open uses.

Plaintiffs cite to excerpts from the report of Dr. Vorhees on the total quantity of PCBs sold for use in the United States, which estimates that over the years, a total of 1.2 billion pounds of PCBs were sold. Plaintiffs argue that Defendants have provided evidence that only 5,538[9] pounds of PCBs were sold to the government, or in other words, that "governmental sales for open uses would account for well less than one one-thousandth of one percent of all sales." (Id. at 6) Plaintiffs characterized this argument as a *de minimis* argument regarding the amount of overall sales of PCBs and contend that Defendants make no showing to the contrary. Plaintiffs further argue that the federal government did not direct Old Monsanto to continue selling PCBs.

In Sur-Reply, Defendants argue that the liberal standard favoring federal officer removal applies even when the removing party is a private company. According to Defendants, all PCBs manufactured under color of federal office, whether for open or closed use, are relevant because "it is impossible to determine whether PCBs in a given person's body emanated from open or closed applications." (ECF No. 34 at 3)(quoting ECF No. 30 at 5) Relying on invoices in evidence, Defendants contend that Old Monsanto had many direct contracts with the federal government for the manufacture of PCBs. Next, Defendants contend that the federal government also ordered Old Monsanto, pursuant to the Defense Production Act, to sell PCBs to defense contractors for open applications. Finally, Defendants contend that the records show that a significant volume of PCBs were manufactured under federal office.

In Sur-Rebuttal, Plaintiffs note that Judge Fleissig issued an opinion granting their motion to remand in Bailey, et al. v. Monsanto Company, et al., Cause Number 4:15 cv844 AGF, 2016

---

[9]This calculation is based on the seven invoices in Exhibit Y showing Old Monsanto's direct sales of 5,038 pounds of PCBs to federal governmental agencies for use in open applications. (4:15 cv 1825, ECF No. 23-25, at 6, 8, 9, 11, 12, 13 and 25) Included in this total amount is the additional 500 pounds reflecting the sale of PCBs for use in an open application in an exhibit attached to the notice of removal. (4:15 cv 1825, ECF No. 1-2 at 12)

WL 1258636 (E.D. Mo. Mar. 31, 2016), a case involving similar claims for damages arising from

environmental PCB exposure, the same defendants,[10] and the same jurisdictional issue – federal

officer jurisdiction.   In her decision, Judge Fleissig granted the parties' motions for leave to

supplement the record[11] and expressly considered the supplemental evidence.[12]

---

[10] Except in the <u>Bailey</u> case, Pfizer, Inc. was named as a defendant.

[11] A review of the record shows that all of the exhibits attached to Defendants' Motion to Supplement the Factual Record Supporting Federal Officer Removal (4:15 cv 844 AGF, ECF No. 75) have been filed in this case except for Exhibit C, November 27, 1941, request for issuance of a Necessity Certificate to the Secretary of War and the Advisory Commission to the National Defense.   <u>See</u> Exhibit A - May 21, 1941, request for issuance of a Necessity Certificate to War Advisory Committee to the Council of National Defense pursuant to IRS Code - (ECF No. 75, Exh. A, pages 9-26)/(ECF No. 23, Exh. D)/(ECF No. 75, Exh. A, pages 1-8)/(ECF No. 23, Exh. E); Exhibit B- July 16, 1941, request for issuance of a Necessity Certificate to the National Defense - (ECF No. 75, pages 2-14)/(ECF No. 23, Exh. G)/(ECF No. 75, pages 15-36)/ (ECF No. 23, Exh. H); Exhibit C - November 27, 1941, request for issuance of a Necessity Certificate to the Secretary of War (ECF No. No. 75, Exh. C);    Exhibit D -Document showing that the Necessity Certificates were granted (ECF No. 75, Exh. D)/(ECF No. 23, Exh. F); and Exhibit E - correspondence showing that after Old Monsanto determined to cease production of PCBs for use in open applications, the federal government directed Old Monsanto to continue production for defense contractors (ECF No. 75, Exh. E, pages 2-3)/(ECF No. 23, Exh. U);(ECF No. 75, Exh. E, pages 4-12)/(ECF No. 23, Exh. V); (ECF No. 75, Exh. E at page 13)/(ECF No. 23, Exh. W); (ECF No. 75, Exh. E at page 14)/(ECF No. 23, Exh. X).

[12] As to the supplemental evidence, Judge Fleissig opined as follows:

> The documents from 1941-1942 consist of three requests for issuance of a Necessity Certificate made to the Secretary of War and The Advisory Commission of National Defense between May 21 and November 27, 1941, and granted between August 6, 1941 and March 13, 1942.  Each of these three requests was for government funding for new facilities to increase production of PCBs.  The first application states that the new facility would increase PCB production from 720,000 to 1,200,000 pounds per month and that 100% of the "increase in productive capacity [would] be directly or indirectly absorbed in the Defense Program."  (Doc. No. 75-1 at 5.) [4:15 cv 1825, ECF No. 23-5 at 5]  The application also states that Old Monsanto had no contract with the government or its agencies for supply of diphenyl, but that there was "no doubt that a substantial part of Firestone's rubber products are today being required for defense purposes," and that four named electric companies use the product for transformers, condensers, and similar products.  <u>Id.</u> at 4. [4:15 cv 1825, ECF No. 23-5 at 4]  The

According to Plaintiffs, the amount of sales of PCBs to the government that are in any way

relevant is even more *de minimis* in this case because their claims concern only PCBs sold for open

uses, whereas in the <u>Bailey</u> case, their claims covered open and closed uses.   In <u>Bailey</u>, Plaintiffs

provided excerpts from a expert report showing that an estimated total of 1.2 billion pounds of

PCBs were sold for domestic use.   Plaintiffs then argued "that Defendants had provided evidence

that only 47,000 pounds of PCBs were sold to the government, or, in other words, that 'slightly

more than one one hundredth of one percent of all of [Old] Monsanto's PCB sales were made to

---

Office of Production Management recommended 100% certification, noting that PCBs were essential in the insulation of Navy cable and that there was a demand for this product to fill government orders which was "greater than can be supplied with present production facilities."   *Id.* at 10, 14-15.    [4:15 cv 1825, ECF No. 23-4 at 3, 7-8]   The second request for additional funding again states that 100% of the increased production would be "directly or indirectly absorbed in the Defense Program."   (Doc. No. 75-2 at 5.) [4:15 cv 1825, ECF No. 23-7 at 5]   The Office of Production Management recommended that the Certificate of Necessity be granted 100%, noting that the project would increase the annual production of PCBs by 7,200,000 pounds annually and was "necessary in the interest of national defense during this emergency period...."   *Id.* at 23. [4:15 cv 1825, ECF No. 23-7 at 10] The application also stated that Old Monsanto did not expect to furnish any of this material to the Army or Navy.   *Id.* at 3.   [4:15 cv 1825, ECF No. 23-7 at 3]

\*\*\*

The proposed new evidence also shows that in 1972, the federal government directed Old Monsanto, pursuant to the Defense Production Act of 1950, to sell 3,000 pounds of PCBs to one military contractor, and in 1974 to sell three 55 gallon drums to another military contractor.   The directives were issued despite Old Monsanto's objection to fill these military contractors' orders because of the environmental problems of PCBs in "open systems." [(4:15 cv 844, ECF No. 75, Exh. E, pages 2-3)/(4:15 cv 1825, ECF No. 23, Exh. U);(4:15 cv 844, ECF No. 75, Exh. E, pages 4-12)/(4:15 cv 1825, ECF No. 23, Exh. V); (4:15 cv 844, ECF No. 75, Exh. E at page 13)/(4:15 cv 1825, ECF No. 23, Exh. W); (4:15 cv 844, ECF No. 75, Exh. E at page 14)/(4:15 cv 1825, ECF No. 23, Exh. X)]

<u>Bailey</u>, 4:15 cv 844 at 19-20 (the undersigned omitted the paragraph discussing the exhibit filed in Judge Fleissig's case but not in his case, the request for issuance of a Necessity Certificate to the Secretary of War on November 27, 1941).

the government.'" Bailey, 4:15 cv 844 at 17. In this case, Plaintiffs contend that since they have limited their wrongdoing on the part of Defendants with regard to the sales of PCBs for open uses, the evidence about sales of PCBs to the federal government for closed uses is irrelevant.

## III. Discussion

This Court's subject matter jurisdiction over the case at bar if any is based on the provisions of 28 U.S.C. § 1442 and 28 U.S.C. § 1446. Section 1442 states:

> (a)   A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1)   The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).   Section 1442(a)(1) "grants independent jurisdictional grounds over cases involving federal officers where a district court otherwise would not have jurisdiction."   Johnson v. Showers, 747 F.2d 1228, 1229 (8th Cir. 1984) (quotation omitted).   Under 28 U.S.C. § 1442(a)(1), federal officer jurisdiction is appropriate whenever it is shown that:   (1)   the defendant acted under the direction of a federal officer; (2) a "causal nexus" exists between the plaintiff's claims and the actions taken by the defendant under color of its federal office; (3) the defendant has a colorable federal defense to the plaintiff's claims;   and (4)   the defendant is a "person" within the meaning of the statute.[13]   Jacks v. Meridian Res. Co., LLC, 701 F.3d 1224,

---

[13]In Plaintiffs' Motion to Remand, "Plaintiffs acknowledge that defendants are 'persons' within the meaning of the statute" so the undersigned need not address this element.   (ECF No. 14 at 2). Corporate entities are considered "persons" for purposes of § 1442(a)(1).   See Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 398 (5th Cir. 1998); Alsup v. 3-Day Blinds, Inc., 435 F. Supp.2d 383, 845 n.3 (S.D. Ill. 2006) (agreeing with the weight of authority that a corporation is a "person" within the meaning of the statute).

1230 (8th Cir. 2012). The removing party bears the burden of proving the grounds supporting federal officer removal. Ruppel v. CBS Corp., 701 F.3d 1176, 1180 (7th Cir. 2012).

Not all relationships between private entities or individuals and the federal government are sufficient to effect removal under the federal officer statute. To fall within the parameters of the federal officer removal statute, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[] officers fulfill other basic governmental tasks." Watson, 551 U.S. at153; Isaacson v. Dow Chem. Co., 517 F.3d 129, 137 (2d Cir. 2008) (A private actor acts under federal officer when it "*assist[s]*, or help[s] *carry out,* the duties or tasks of the federal superior") (quoting Watson, 551 U.S. at 152). "Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." Watson, 551 U.S. at 153. The production of Agent Orange by a private defense contractor, Dow Chemical, to help the government conduct a war is an example of the sort of assistance contemplated by the statute. Id. at 153-54 (citing Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir. 1998)).

In 2011, Congress added the words "or relating to." This amendment was "intended to broaden the universe of acts that enable Federal officers to remove to Federal court." In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia, 790 F.3d 457, 467 (3d Cir. 2015) (citing legislative history).

As to the federal officer removal, Judge Fleissig held as follows:

> It is undisputed that Defendants are persons within the meaning of the statute. With respect to the "acting under" requirement, the Supreme Court explained as follows in *Watson*: "Section 1442(a)(1)'s words 'acting under' are broad, and the statute must be liberally construed. But broad language is not limitless. And a liberal construction nonetheless can find limits in a text's

language, context, history, and purposes." *Watson*, 551 U.S. at 147. In that case the Court rejected a cigarette manufacturer's argument that it acted under the federal government because it was subjected to heavy regulation. *Id.* at 152. Drawing on its previous federal officer removal cases, the Court held that "'acting under' must involve an effort to assist, or to help carry out, the federal superior's duties or tasks." *Id.* "Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Ruppel*, 701 F.3d at 181. "'Acting under' covers situations ... where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Id.*

The Court concludes that here, in light of the supplemental evidence submitted by Defendants, a somewhat close question is presented as to what extent Defendants have met the "acting under" requirement for federal officer removal. Upon review of the record before it, the Court concludes that this requirement is met only with respect to the PCBs that Old Monsanto sold directly to the government or to others at the direction of the government. Although the government required the use of PCBs in certain products during the relevant time period, and provided financial assistance to Old Monsanto to manufacture them in the early 1940s, Defendants sold the PCBs, by and large, to government contractors and not to the government itself. Defendants have not maintained that the manufacturing process itself was in any way supervised or controlled by the government. *Cf. Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1054 (S.D. Ill. 2009) (concluding that the Monsanto defendants in that case - Pharmacia, Solutia, Pfizer, and New Monsanto - were not entitled to federal officer removal of claims challenging their production and disposal of PCBs based on their argument that the government directed them to produce PCBs, as the evidence failed to show such direction).

This is in contrast to, for example, Agent Orange cases, in which courts have routinely held that the manufacturers of Agent Orange were entitled to federal officer removal in cases asserting negligence and products liability claims, because the companies directly contracted with the government for the production of Agent Orange and the chemical was produced to the detailed specifications of the government. *See, e.g., Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137-38 (2nd Cir. 2008); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398-99 (5th Cir. 1998).

The Court also concludes that Defendants have failed to meet the causal connection requirement for federal officer removal. The Court finds Plaintiffs' *de minimis* argument persuasive in the context of the rather novel theory of liability raised in this case. Plaintiffs' theory of liability is premised on their exposure to PCBs that over decades accumulated and persisted in the environment and food chain. Although the "calculus" is changed by the supplemental evidence, the

record before the Court still shows that the amount of PCBs manufactured by Old Monsanto pursuant to direct contracts with the government, together with the amounts sold to federal contractors at the direction of the government, and even together with the amounts manufactured to meet the needs of defense contractors during the years of the Second World War, relative to the total amount of PCBs allegedly persisting in the environment and food chain, is simply too small to satisfy the requirement that there be a causal connection between the conduct that was taken under federal authority and Plaintiffs' claims. This dictates against finding federal officer removal.

Bailey, 4:15 cv 844 at 31-32.

Like the Bailey court, this Court concludes that, based on the evidence in the record, Defendants have met the "acting under" requirement for federal officer removal only as to the PCBs that Old Monsanto sold directly to the government, or to others at the direction of the government. The evidence shows that, although the government required the use of PCBs in certain products and provided financial assistance to Old Monsanto to manufacture PCBs during World War II, Old Monsanto sold the PCBs mostly to government contractors and not to the government itself. Furthermore, the evidence does not show that the manufacturing process was supervised or controlled by the government. Cf., Anderson v. Hackett, 646 F. Supp. 2d 1041, 1054 (S.D. Ill. 2009) (finding that Monsanto defendants were not entitled to federal officer removal of claims challenging their production and disposal of PCBs as the evidence failed to show defendants were directed by government to continue to produce PCBs). Likewise, Defendants have failed to show that the PCBs were produced to the detailed specifications of the government or that Old Monsanto was compelled to produce the PCBs under threat of criminal sanction. See, e.g., Isaacson, 517 F.3d at 137-38 (court explicitly looked to the federal government's specifications that created a unique product, Agent Orange for military use in the Vietnam War, which formed the basis for the plaintiffs' claims in finding chemical manufacturers

entitled to federal officer removal); <u>Winters</u>, 149 F.3d at 399-400 (court found federal officer removal appropriate because the chemical companies were compelled by the government to produce and deliver the product Agent Orange pursuant to detailed regulations under threat of criminal sanction).

Next, the Court finds that Defendants have failed to meet the causal connection requirement for federal officer removal. In this case, Plaintiffs argue that any federal officer considerations are even more *de minimis* than the <u>Bailey</u> case inasmuch as their claims concern only PCBs manufactured and sold for open applications. In the Petition, Plaintiffs explicitly allege strict liability and negligence only as to open applications.[14] In comparison, the <u>Bailey</u> Plaintiffs' claims were not so limited as their claims were based on the manufacture of all PCBs by Old Monsanto. Thus, the subset of PCBs to be considered is smaller than the amount of PCBs in the <u>Bailey</u> case. The excerpts from the report of Dr. Vorhees on the total quantity of PCBs sold for use in the United States estimates that over the years, a total of 1.2 billion pounds of PCBs were sold. (4:15 cv 844, ECF No. 52-1 at 4/4:15 cv 1825, ECF No. 23-27 at 4) The record shows that 5,538 pounds of PCBs were sold for open applications to the federal government and so the governmental sales for open applications would account for less than one one-thousandth of one percent of overall sales of PCBs. Even accepting as true Defendants' claimed amount of PCBs

_____

[14]Courts have recognized that plaintiffs can elect to sue for some exposures and not others, or that some exposures are actionable and some are not. <u>See</u> <u>Maguire v. A.C. & S., Inc.</u> 2015 WL 4934445, at * 2 (S.D.N.Y. Aug. 18, 2015) (the court found plaintiff's abandonment of all claims stemming from "exposure to asbestos 'aboard any military vessel or vehicle, on or at any shipyard or on or at any governmental facility or location'"... "sufficiently excises the claims that led to removal on the grounds of a federal-contractor defense as to justify remand"); <u>Hayden v. 3M Co.</u>, 2015 WL 4730741, at *3 (E.D. La. Aug. 10, 2015); <u>Phillips v. Asbestos Corp., Ltd.</u>, 2014 WL 794051, at *1 (N.D. Cal. Feb. 26, 2014).

and indulging all inferences in Defendant's favor,[15] the record establishes the amount of sales of

PCBs manufactured by Old Monsanto for open uses pursuant to contracts with the government and

sold to federal contractors at the direction of the government relative to the amount of PCBs

allegedly persisting in the environment and food chain is too small to satisfy the requirement that

there be a causal connection between the conduct that was taken under federal authority and

Plaintiffs' claims.   See Bailey, 4:15 cv 844 at 32.   The undersigned agrees with Judge Fleissig,

"[t]his dictates against finding federal officer removal."   Id.

      At oral argument, Defendants argued there is even more evidence in this case, in particular

Exhibits A, C, I, J, K, L, M, N, O, P, Q, and R, which were not before Judge Fleissig in Bailey,[16]

showing that the federal government approved the exact specification of production of

applications using PCBs.   Exhibit A is a December 1996, report, Risk Assessment of

Polychlorinated Biphenyls (PCBs) On-Board Navy Ships, noting that the Department of Defense

selected PCBs for use in many applications because of their performance characteristics.   (ECF

No. 23-1)   Exhibit C is a February 8, 1945, letter in response to a query regarding the fifth renewal

of the Army-Navy E at the Anniston, Alabama plant.   (ECF No. 23-3)   In relevant part, the

assistant public relations director noted that, "[v]ery little of the production of the Anniston,

---

[15]At oral argument, Defendants claimed that this case involves six times the amount of PCBs as
compared to the amount determined in Bailey case.   In Bailey, Defendants provided evidence that
47,000 pounds of PCBs were sold to the government.   (4:15 cv 844, ECF No. 52 at 6)   Accepting
for the sake of argument Defendants' claim that this cases involves six times the amount of PCBS,
in other words 282,000 pounds, this would mean approximately .024 percent of all of Old
Monsanto's PCB sales were made to the government.

[16]Based on the record, it appears that Defendants most likely possessed these exhibits when they
filed their Motion to Supplement the Factual Record Supporting Federal Officer Removal in
Bailey (4:15 cv 844, ECF No. 75, filed 1/28/2016) considering Defendants attached these exhibits
to their Opposition to Plaintiffs' Motion to Remand (4:15 cv 1825, ECF No. 23, filed 2/4/2016)
one week later.

Alabama plant is shipped on direct Government contracts.   Most of the production is shipped as a raw material to other plants engaged in war production....   In the case of aroclors, we understand the majority of our current production is used in end products for use in war plants and for use as Army and Navy material.   Other users include Anaconda Cooper for the manufacture of Navy cables, General Electric and Westinghouse Electric."   (Id.)   The author acknowledged that "it would be impossible for us to be able to give you any exact percentage of how many of the end uses are directly concerned with the war program."   (Id.)   Exhibits I, J, K, L, and M relate to the award and renewal of the Army-Navy "E" Award.   (ECF No. 23, 9-13)   The Army-Navy "E" Award is the highest award for efficiency and excellence in wartime production, and the Navy gave Monsanto the award for its "'extraordinary' accomplishment in production of raw materials essential to the Allied war program" and the Anniston, Alabama plant for its production of war products including Aroclors.   (ECF No. 23, Exhs. I, M)   Exhibit N is a federal specification for heat-resisting aluminum paint used by the military calling for the use of   materials including Aroclor 1254.   (ECF No. 23-14)   Exhibit O is the March 3, 1970, Call Report regarding a call to Republic Powdered Metals concerning the amount of Aroclor 1254 and Aroclor 5460 used in producing a heat resistant aluminum paint used by the Navy.   (ECF No. 23 - 15)   Exhibits P, Q, and R show production of Aroclor 1254 for defense contractors Chemical Products to produce cellulosic lacquer, Marblette Company to produce electrical wire, and another company to produce wire coating compound for the Navy.   (ECF No. 23- 16-18)   The Court finds that these exhibits do not show that the federal government provided direct specifications regarding the production and sale of PCBs.   Furthermore, the exhibits do not show that the federal government compelled Old Monsanto to produce and sell PCBs.

In further support, Defendants cite to Raytheon's purchase of Aroclor 1242 to enable the continued manufacture of missiles and the 1972 report by the Interdepartmental Task Force on PCB entitled "Polychlorinated Biphenyls and the Environment."[17]   In the April 25, 1973, telex to Monsanto from Raytheon, the terms and conditions governing the purchase order for Aroclor are set forth.   (4:15 cv 844, ECF No. 22-6/4:15 cv 1825, ECF No. 1-5)   Raytheon made concessions to Monsanto "to obtain [Monsanto's] agreement promptly to ship Aroclor 1242 and because the Government has directed us to proceed to manufacture missiles but has refused to authorize Raytheon to qualify a new potting material which would avoid use of Aroclor 1242.   We also wish to acknowledge the fact that Monsanto in all of our dealings has expressed a strong preference not to sell this product to us and is proceeding with the sale only at the direction of the Government...."   (Id at 4)   The exhibit does not show the federal government compelled Monsanto to manufacture and sell the PCBs.   Likewise, although the Task Force report shows that Monsanto was not banned by the federal government from continuing to manufacture PCBs, this does not show that the federal government directed Monsanto to continue to manufacture PCBs.   (4:15 cv 844, No. 22-2/4:15 cv 1825, ECF No. 1-3); see Anderson, 646 F. Supp. 2d at 1054 ("[t]he Monsanto defendants were not banned by the federal government from continuing to produce PCB; that is a far cry from being directed by the federal government to continue to produce PCBs.").   Finally, the Raytheon telex appears to relate to a closed application, which is outside the scope of this lawsuit.

After the oral argument, Defendants filed a supplemental list of exhibits in support of federal officer removal, noting that these exhibits were not filed in the Bailey case except one invoice dated June 21,1971 in Exhibit Y (4:15 cv 1825, ECF No. 23-25).   See Defendants'

---

[17]These exhibits were also filed in the Bailey case.   See 4:15 cv 844, ECF Nos. 22-2, 22-6.

Identification of Evidence Supporting Federal Officer Removal Not Considered in *Bailey* (4:15 cv 1825, ECF No. 38).[18]   Exhibit A is a 1976 military report identifying several PCB-containing items found on nuclear submarines.   (4:15 cv 1825, ECF No. 23-1)   Exhibit Y is a collection of 25 sales invoices showing Old Monsanto's direct sales of PCBs to federal governmental agencies, with seven invoices showing sales of 5,038 pounds for use in open applications.   (4:15 cv 1825, ECF No. 23-25, at 6, 8, 9, 11, 12, 13 and 25)   Exhibit AA is expert witness Donna Vorhees' affidavit regarding a substantial portion of the PCBs to which Plaintiffs have been exposed were originally manufactured by Monsanto.   (Id. at 23-27)   Exhibit BB a 1950 license agreement covering liquid dielectric material for electrical devices between General Electric Company and Old Monsanto.   (Id. at 23-28)   Exhibit CC is a 1965 license agreement covering liquid dielectric material for electrical devices between Old Monsanto and General Electric Company.   (Id. at 23-29)   Exhibit DD is the EPA's Explanation of Significant Differences for the 1991 Record Decision at the Westinghouse Superfund Site.   (Id. at 23-30)   Exhibit EE is the Department of Transportation's 1991 report regarding the handling and disposal of PCBs.   (Id. at 23-31)   Exhibit GG is a 1960 Monsanto technical bulletin analyzing Aroclor plasticizers.   (Id. at GG)[19]   None of the exhibits show the federal government ever imposed specifications for Old Monsanto's production of PCBs or compelled Old Monsanto to manufacture   PCBs and thus do not support federal officer removal.

---

[18]Although Defendants listed Exhibits C, I, J, K, L, M, N, O, P, Q, and R on their supplemental list, Defendants identified these exhibits as supporting federal officer removal during oral argument. As discussed above, these exhibits do not show that Old Monsanto was ever compelled by the federal government to manufacture and sell PCBs or that the government ever imposed specifications for Old Monsanto's production of PCBs.

[19]Further, the exhibits cited by Defendants filed with their Sur-Reply, Exhibits B, C, D, and E do not alter the Court's decision.

Moreover, the Court need not address the merits of Defendants' asserted preemption defenses constituting colorable federal defenses argument because the Court's decision remanding the action due to lack of federal officer jurisdiction renders as moot any decision on preemption.

## CONCLUSION

The Court finds that Defendants have failed to meet their burden of showing that removal of this action was proper. Therefore, Plaintiffs' Motion to Remand (ECF No. 13) will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs Thomas Kelly and Michael Krzeszewski's Motion to Remand this case to state court due to lack of federal officer jurisdiction (ECF No. 13) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall take all necessary steps to remand this case to the state court in which it was filed.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this __29th__ day of June, 2016